[L. A. No. 14012. In Bank.—June 29, 1933.]

L. A. ABBOTT, Appellant, v. ED F. COOPER et al., Respondents.

Curtis Hillyer, Irve C. Boldman and Hillyer & Boldman for Appellant.

Wright & McKee, C. M. Monroe and Harvey H. Atherton for Respondents.

Everett W. Mattoon, County Counsel (Los Angeles), and S. V. O. Prichard, Deputy County Counsel, as *Amici Curiae.*

SEAWELL, J.—This appeal is taken from a judgment of nonsuit entered by the Superior Court in and for the County of San Diego against plaintiff and in favor of defendants Ed F. Cooper, as sheriff of the county of San Diego; Edwin S. Macy, deputy sheriff and jailer; The Fidelity & Deposit Company of Maryland, said sheriff's bond, conditioned for the faithful performance of official duty of himself and his deputies, and Harry Webber, a constable in and for said county of San Diego. Judgment by default in the sum of $2,000 was rendered by the trial court at the conclusion of the trial against two other defendants, C. V. Carson and H. Atlee Worsham, both of whom were deputy constables under said Webber, from which no appeal was taken.

The action was brought against said defendants to recover damages suffered by plaintiff by reason of his unauthorized arrest and imprisonment by the persons and in the manner herein related. There is no dispute as to the facts as

testified to by the plaintiff, who was the sole witness in the case.

In addition to being deputy constables under Constable Webber, Carson and Worsham were engaged in conducting a private police patrol in or about the city of San Diego. L. A. Abbott, the plaintiff, was also engaged in conducting a rival private police patrol in said city of San Diego, and was also a deputy constable by appointment of another constable whose jurisdiction also included the territory of the township of San Diego. Abbott, at the time he was arrested, was operating under a license from the state board of prison directors. He was dressed in a blue uniform and was wearing on his person a constable's badge of office, and also a badge showing that he was in the service of the state board of prison directors. All of the parties to the action were well acquainted with one another, both personally and officially. It is a reasonable inference from the uncontradicted evidence that a rivalry existed between the private police patrol headed by Carson and Worsham and that headed by Abbott. From the testimony given by Abbott, which will hereafter be referred to, it is also fairly inferable from said testimony that the feeling of hostility existing on the part of Carson and Worsham against Abbott was shared by the sheriff and his deputy. Carson, upon delivering Abbott to Macy, the jailer in charge, stated to him that he was "carrying out his orders", and ordered the jailer to lock Abbott up. The jailer, who beyond question recognized Carson as a person in authority in the premises, yielded ready compliance with Carson's orders, and locked Abbott up without a semblance of authority, warrant or right to do so. Whence Carson's orders does not directly appear from the scant record before us, but as the sheriff was the only person who could have given orders which the jailer would have felt bound to obey, the inference may be drawn that Carson was acting under an understanding with the sheriff as to the kind of treatment that should be accorded Abbott should opportunity present itself. Doubtless Carson did not mean that he was carrying out orders given by himself, but orders which he had received from someone in authority. This inference is strengthened by what was said and done at the jail as summarized by the District Court of Appeal, Fourth District, when this cause

was before that court upon appeal. The unchallenged authority which Carson exercised in giving orders to the jailer and the latter's obedience to said orders, all of which stands admitted upon the record, are made evident by the following excerpts taken from the opinion of said District Court of Appeal, which correctly states the evidence of the only witness called to testify in the case and the law applicable to said facts as herein set forth:

"About 2 o'clock on the morning of November 26, 1930, Carson and Worsham arrested the plaintiff and took him to the county jail, where, upon their request and order, he was locked up by the defendant Macy, who, as a deputy under the defendant Cooper, the sheriff of San Diego county, was in charge of the jail. The plaintiff was held in jail for about eight and one-half hours and then released . . .

"It appears from the evidence that on the night in question, the appellant and one of his assistants, named Sizer, were driving along in an automobile upon a mission connected with their business of a private police patrol. While so proceeding they came upon Carson and Worsham, whose car had in some manner become caught in a bridge, and stopped and assisted them in extricating their car. Carson and Worsham recognized the appellant and called him by name. Shortly after the appellant drove on, Carson and Worsham followed him and ordered him to pull into the curb. When he complied Worsham asked him what he was looking for and upon receiving the reply 'I don't know as that is any of your business', Carson ordered the appellant from his car and told him he was under arrest. The appellant's gun was taken from him and he, with Sizer, was taken to the county jail. The respondent Macy received the appellant and took from him various articles, including his deputy constable badge and his private police badge. Upon the appellant's asking Macy the reason for his detention, Macy turned to Carson and asked him what the charges were, to which Carson replied: 'Damned if I know. Damned if I believe he is allowed out in the county. We will leave him in here over night and let Sheriff Cooper decide it in the morning.' Whereupon Macy asked Carson if Sizer was to be arrested also, to which Carson replied: 'No, he is our friend; we don't want him, we want Abbott.' Thereupon Sizer was released. The appellant also testified

that he was refused permission to use the telephone; that he asked to be released on bail, saying: 'I am a bonded man. If I have to have bail, can't I get out on bail.' Macy replied: 'No, it's up to Carson, if he wants to let you out, it's all right.' Macy then asked Carson if he would let the appellant out and Carson replied: 'No, I am carrying out my orders, lock him up.' . . . About 8:30 o'clock the next morning he was handed his articles and told to 'get out of here'.

"This, being the only evidence, must be taken as true in view of the motion for nonsuit, and all reasonable inferences therefrom must be drawn in favor of the appellant. It seems a fair and reasonable inference from this evidence that the arrest in question was made because of some rivalry between the respective private patrols and not because of any offense committed by the appellant. So far as appears from the evidence, there was no justification for the arrest, it was made without authority of law, and for the purposes of this appeal it must be held to have been unauthorized and unlawful. The only questions raised relate to the responsibility of parties other than those making the arrest.

"The first question presented is as to the liability of respondent Macy. The appellant argues that it appears from the evidence that Macy knew or should have known that the arrest was illegal and that he had no right to imprison the appellant. On behalf of this respondent it is urged that, under sections 142, 1597 and 1611 of the Penal Code, and section 4157 of the Political Code, it was his duty to receive and hold the appellant when presented at the jail as a prisoner by the defendant Carson, a police officer. It is argued that such a jailer is merely a ministerial officer and that it is no part of his duty to make any investigation or any decision as to whether or not any person brought to the jail shall be kept there. While it should not be held to be the duty of a jailer to make any extensive investigation before receiving a prisoner brought to him for custody, we think this contention of this respondent cannot be fully sustained. This arrest was made without a warrant and whether Carson and Worsham be considered as having made the arrest as deputies of a constable or as private persons, they were only authorized to make an arrest for an offense committed or attempted in their presence or

under certain circumstances upon the belief that the person arrested had committed a felony (Pen. Code, secs. 836 and 837). In *Boaz* v. *Tate,* 43 Ind. 60, the court said:

" 'We have said that the marshal had authority to arrest when the offense was committed in his view and, under certain circumstances, commit to jail; that such authority necessarily conferred upon the jailer the right to receive and imprison the prisoner. If he had the right to receive the prisoner when brought to him by the marshal with the declaration that he had been arrested for any offense committed on view, that declaration would stand in the place of a *mittimus* in other cases, and it would be the duty of the jailer to receive him as a prisoner, without regard to the question of his guilt or innocence.'

"Conceding that a similar rule applies in this state and that a jailer is justified in receiving a prisoner without a warrant upon the declaration of the officer or person bringing him in that the arrest has been made for an offense on view or in the belief that a felony has been committed, the circumstances here fall far short of showing any such justification. Even if it could be held that a jailer is authorized to receive and hold a prisoner in the absence of any statement or declaration on the part of the officer or person bringing him in, we think it must be held that such a jailer has no authority to receive and place in custody a person brought in by another when the information furnished to the jailer affirmatively shows that the arrest has been made without authority, and that the person making the arrest neither knows what the charge is nor makes the claim that any offense has been committed either in his presence or otherwise. We think the information here conveyed to the respondent Macy was such that he knew or should have known that the arrest was illegal, and was such as to inform him that he had no right to imprison the appellant. It follows that, so far as shown by this evidence, the respondent Macy was himself liable for his wrongful act, whether done officially or otherwise. (*Gomez* v. *Scanlan,* 155 Cal. 528 [108 Pac. 12]), and that, as to him, the judgment of nonsuit was improperly entered."

This brings us to a consideration of the question whether the sheriff and his surety and Constable Webber are liable for the acts of their respective deputies committed as

herein set forth. The trial court held, as did said District Court of Appeal, that the acts of said deputies were extra-official acts and neither the principals nor their sureties are liable therefor.

It is not contended by any party to the action that said arrests were made upon a warrant of arrest, or for a crime committed in the presence of said arresting officers, or that plaintiff was delivered to said jailers upon the authority of a *mittimus,* or that any declaration was made to the jailer by said officers that plaintiff had committed a crime in the presence of either of said arresting officers, which declaration may satisfy the law or take the place of a *mittimus.* On the contrary, when the jailer inquired as to the charges made against Abbott, Carson replied, "Damned if I know. Damned if I believe he is allowed out in the county." He finally decided that plaintiff should be kept in jail overnight, and his fate left to the decision of the sheriff upon his arrival at a later hour. It is admitted that the acts of the jailer in detaining plaintiff in prison were unauthorized and unlawful, but it is the contention of respondents that the jailer's conduct was so patently unwarranted as to have amounted to conclusive proof that he knew that he was committing a trespass in detaining plaintiff in the circumstances of plaintiff's delivery to him, and therefore, as he was not acting under color of his office, his principal and the surety are not liable. We cannot subscribe to this doctrine, as it would tend to excuse or mitigate the wrongful acts of the officer if said acts were accompanied by unusual acts of oppression or amounted to a flagrant abuse of official duty, and penalize the offender only when his acts were less culpable. The fallacy of respondents' argument is well met in *Clancy* v. *Kenworthy,* 74 Iowa, 740 [35 N. W. 427, 428, 7 Am. St. Rep. 508], and by many other decisions spread throughout the states which adopt the reasoning of the Iowa court, from which we quote:

"But it is insisted that, as the constable is shown to have had no lawful authority to arrest plaintiff, his act was therefore not done in the line of his duty. In truth, his act was in the line—direction—of official duty, but was illegal because it was in excess of his duty. In the discharge of official functions he violated his duty and oppressed the plaintiff. That is all there is of it. If, in exercising the

functions of his office, defendant is not liable for acts because they are illegal or forbidden by law, and for that reason are trespasses or wrongs, he cannot be held liable on the bond at all, for the reason that all violations of duty and acts of oppression result in trespasses or wrongs. For lawful acts in discharge of his duty he, of course, is not liable. It follows that if defendant's position be sound, no action can be maintained upon the bond in any case. In support of our conclusions, see *Tieman* v. *Haw*, 49 Iowa, 312." (See, also, *Grennius* v. *American Surety Co.*, 92 Wash. 401 [159 Pac. 384, L. R. A. 1917F, 1134].)

In holding that a deputy sheriff and his principal and sureties were liable for the act of a deputy falsely claiming to have a warrant for a person not formally charged with crime, and who, under guise of authority of his office arrested and took a person into custody, had committed an unlawful and unauthorized act under color of his office the Supreme Court of North Dakota, in *Lee* v. *Charmley*, 20 N. D. 570 [129 N. W. 448, 449, 33 L. R. A. (N. S.) 275], said:

"The almost uniform current of the later cases . . . regards wrongful acts of a public officer *colore officii* as official acts for which the sureties upon his bond are liable. Such is the holding of the courts of last resort of Pennsylvania, Maine, Massachusetts, Ohio, Virginia, Kentucky, Missouri, Iowa, Nebraska, Texas, California, Minnesota, Illinois and of the Supreme Court of the United States. And in reviewing these authorities this court in one of its former opinions, has remarked: 'While there is a dispute among the authorities whether the sureties on a sheriff's bond are liable for the wrongful act of their principal in seizing the property of a third person, the more numerous decisions are found arrayed in support of the rule that they are liable, and these cases appear to us to have the best of the argument. See *Lammon* v. *Feusier*, 111 U. S. 17 [28 L. Ed. 337, 4 Sup. Ct. 286], where the authorities are reviewed and where the doctrine we deem sound is enunciated.''

*Lammon* v. *Feusier*, last above cited, holds upon a review of a long list of cases that where a person holding the office of sheriff or constable does acts *colore officii*, though he had no sufficient warrant to do the act, he is responsible to third persons in an action for a breach of official duty. Such a rule is declared to be supported by the weight of au-

thority. We may paraphrase the language of that decision and say, as was there said, respondent Macy was an officer in charge of a county jail, and had authority to detain persons charged with crime on a suitable writ or process. He assumed to have such authority and thereupon took from plaintiff Abbott all of his personal property and refused to release him or permit him to arrange for bail by telephone message or otherwise, and held him as a prisoner. He exercised every function a jailer or officer could have exercised in the discharge of official duty.

In *Johnson* v. *Williams*, 111 Ky. 289 [63 S. W. 759, 760, 98 Am. St. Rep. 416, 54 L. R. A. 220], quoting from *Knowlton* v. *Bartlett*, 1 Pick. (Mass.) 273, the court said:

" 'If the act from which the injury resulted was an official act, the authorities are clear that the sheriff is answerable; if it was not an official act, but a personal act, it is equally clear that he is not answerable. But an official act does not mean what the deputy might lawfully do in the execution of his office; if so, no action could ever lie against the sheriff for the misconduct of his deputy. It means, therefore, whatever is done under color or by virtue of his office.' To hold the deputy and his sureties liable to the sheriff on his bond, it is not necessary that the deputy should be acting under color of some writ, but if he is acting under color of his office, and professing so to act, and inducing others interested to believe he is acting *colore officii*, he and his sureties will be bound by such acts. No other rule would be safe. Sureties are not needed on a sheriff's bond if they are only to be held when he acts legally. They vouch for his acts, and bind themselves to make good any damage he may cause to anyone while acting under color of his office."

The Supreme Court of New Mexico, in *State* v. *Llewellyn*, 23 N. M. 43 [167 Pac. 414], upon consideration of the question here presented said:

"The rule exempting sureties from liability for acts *colore officii* was doubtless adopted by many of the courts before the advent of surety companies, whose business it is, for a stipulated compensation, to guarantee the fidelity of officers and employees. The obligation of sureties was then ordinarily assumed without pecuniary compensation, and was not extended by implication or construction. Their liability

was *strictissimi juris*. In this state no definite rule on the subject has been established by the courts, and we see no good reason for a departure from the apparent majority rule that the surety is liable for the acts of the principal *colore officii*. We believe the public interest will be more surely protected and safeguarded by the establishment of such rule here.''

There are unquestionably cases in which the act of the deputy is clearly a trespass or private tort and bears no semblance or show of color to the performance of official duty, and these cases are readily distinguishable from the cases cited above. The three California cases cited by respondents, *Felonicher* v. *Stingley,* 142 Cal. 630 [76 Pac. 504], *Neff* v. *Redmond,* 54 Cal. App. 757 [202 Pac. 925], and *Filarski* v. *Covey,* 75 Cal. App. 353 [242 Pac. 874], more fully illustrate respondents' claim than any others to be found in our reports. The first was an action against the constable and the sureties on his official bond for damages on account of said constable by force and violence compelling a married woman to denude herself for the purposes of examination, and taking from her person certain rings and other personal effects. The second case cited and relied upon was an action brought against a sheriff and the sureties to recover a sum of money deposited with the sheriff upon agreement of the parties interested and later embezzled by his under-sheriff. Said moneys were paid to the sheriff after an attachment which had been levied was discharged and the parties to the action had agreed in writing upon the payment of certain monthly installments to the sheriff. Whatever legal rights the plaintiff had under the writ of attachment were stipulated away and the sheriff was no longer acting in his official capacity. The third cited case was an action brought against a deputy sheriff, his principal and the latter's bond to recover for the negligent operation of an automobile by said deputy sheriff, which caused the death of a minor while said officer was returning from calling upon a magistrate notifying him that a person was held in the county jail awaiting a preliminary hearing.

The above are practically the only decisions of this state which are cited to sustain the judgment of the trial court. That they do not sustain the respondents is obvious from

the abstract of facts herein set forth. It may be added that whenever this court has spoken upon the precise question herein presented the trend of thought seems to favor appellant's contention that said jailer and deputies were acting *colore officii.*

The judgment of nonsuit as to defendants Ed F. Cooper, Edwin S. Macy, Harry E. Webber and the Fidelity & Deposit Company of Maryland, a corporation, is reversed.

Thompson, J., Waste, C. J., Langdon, J., and Curtis, J., concurred.

Rehearing denied.