(No. 6048. July 12, 1934.)

GUDRUN HELGESON and COLLEEN HELGESON, a Minor, By and Through Her Guardian *Ad Litem* GUDRUN HELGESON, Appellants, v. GRANT POWELL, as Policeman of the City of St. Anthony, Idaho; JESSE H. JACKSON, as Deputy Sheriff of Fremont County, Idaho; NATIONAL SURETY COMPANY, a Corporation; STANDARD ACCIDENT INSURANCE COMPANY, a Corporation; J. A. FREDRICKSON, as Sheriff of Fremont County, Idaho; and P. S. WILCOX, GUS A. ISENBURG, E. D. DUKE, THOMAS B. HARGIS, DAN THOMAS, EDGAR M. CHAPMAN, JOSEPH ANDRASEN, TED BUTLER, W. G. JONES and GEORGE A. BROWNING, Jr., Respondents.

[34 Pac. (2d) 957.]

L. Tom Perry and Merrill & Merrill, for Appellants.

F. L. Soule and Thos. B. Hargis, for Respondents, except Grant Powell and National Surety Company. F. A. Miller, for Grant Powell and National Surety Company.

WERNETTE, J.—This is an action to recover damages for the wrongful killing of one Harold Helgeson. The pertinent facts are substantially as follows:

During the late evening of April 25, 1932, at the home of respondent, Jesse H. Jackson, deputy sheriff of Fremont county, two girls reported to him that a man wearing white corduroy trousers and a blue coat was following them. When Jackson made inquiry as to what the man had done, one girl replied, "It is too terrible to tell." The girls pointed out the man who was then about half a block away. Jackson told the girls to go on home and that he would follow the man. Very soon thereafter Jackson got in his automobile and drove to the home of Grant Powell, a policeman of the city of St. Anthony, and explained to him what had happened, suggesting that they go and arrest the man. At the same time he described the manner in

which the man was dressed, adding to the description given him by the girls that the man was wearing a light hat, and also the fact that he would recognize him. The two men then proceeded to the center of town in Jackson's car in search of the individual they were seeking. Both men were dressed as ordinary individuals, with the exception that they both wore officers' stars and carried guns. As the officers approached Bridge Street they observed the now deceased, Harold Helgeson, who was dressed in a pair of white corduroy trousers and a blue coat. Upon observing Helgeson, Jackson said, ''There is the man,'' and pointed Helgeson out to Powell. Jackson drove his car to the curb and stopped. Both men alighted from the car and Powell called to Helgeson to stop. Helgeson started to run and Powell pursued him, again calling to him to stop. Powell then fired two shots, the second shot striking Helgeson and killing him instantly. In the meantime Jackson had jumped in the car and started driving around the block with the apparent intention of meeting Powell and the man he was pursuing. Jackson came up to the point on the sidewalk where Helgeson had fallen about the same time that Powell reached him. Jackson then made the remark, ''I see you got him,'' and ''Well, what had we better do?'' After this, with the assistance of another man who came to the scene, they took the deceased to a doctor's office.

The appellants instituted the action to recover damages against Powell and Jackson, and their respective sureties, and against J. A. Fredrickson, the sheriff, and his bondsmen, for the unlawful killing of Harold Helgeson.

At the commencement of the trial, upon motion for judgment on the pleadings, the court dismissed the cause as against the National Surety Company, surety for Grant Powell. The case, as to the other respondents, was submitted to the jury, which returned a verdict in favor of appellants and against all of respondents, with the exception of the National Surety Company, in the sum of $5,227.24. Judgment on the verdict was entered March 10, 1933. Thereafter all of the respondents, except Grant Powell, Jesse H. Jackson and National Surety Company, moved for

judgment notwithstanding verdict. The court entered an order granting the motions and rendered judgment of dismissal in favor of respondents. This appeal is from the order and judgment.

Respondent, National Surety Company, surety for Powell, filed a motion to dismiss the appeal on the ground that the notice of appeal served and filed was not from the judgment on the pleadings in favor of said National Surety Company.

The only notice of appeal on file particularly recites that the appeal is, "from that certain 'Order Sustaining Motion for Judgment Notwithstanding Verdict,' and the whole thereof, signed on the 27th day of May, 1933, and entered in the above entitled Court and cause on the 31st day of May, 1933, by the terms of which said Order, Motion for Judgment Notwithstanding the Verdict was granted in favor of certain of the above named defendants and judgment ordered entered accordingly in said cause." And further:

"YOU WILL PLEASE TAKE NOTICE that the said plaintiffs, Gudrun Helgeson, and Colleen Helgeson, a minor, by and through her Guardian *Ad Litem,* Gudrun Helgeson, also appeal to the Supreme Court of the State of Idaho from that certain 'Judgment,' and the whole thereof, signed on the 27th day of May, 1933, and entered in the above entitled Court and Cause on the 31st day of May, 1933, whereby and by the terms thereof it was, among other things, ordered that:

"The defendants, Standard Accident Insurance Company, a corporation, J. A. Fredrickson, as Sheriff of Fremont County, Idaho, and P. S. Wilcox, Gus A. Isenburg, E. D. Duke, Thomas B. Hargis, Dan Thomas, Edgar M. Chapman, Joseph Andrasen, Ted Butler, W. G. Jones and George A. Browning, Jr., have judgment against the plaintiffs in this action, and that said action be and the same is hereby dismissed as to each of the last named defendants."

The National Surety Company did not make any motion herein for judgment notwithstanding verdict, nor did the order sustaining the motion for judgment notwithstanding

verdict recite that such motion was sustained as to the National Surety Company. The judgment from which the appeal was taken, signed on the 27th day of May, 1933, was neither for nor against the National Surety Company, in fact the said surety company was not mentioned in the judgment.

In order to give this court jurisdiction, the serving and filing of a proper notice of appeal is necessary. Section 11–202, I. C. A., provides:

"An appeal is taken by filing with the clerk of the court in which the judgment or order appealed from is entered, a notice stating the appeal from the same, or some specific part thereof, and serving a similar notice on the adverse party, or his attorney. The order of service is immaterial, but the appeal is ineffectual for any purpose unless within five days after service of the notice of appeal, an undertaking be filed, or a deposit of money be made with the clerk, as hereinafter provided, or the undertaking be waived by the adverse party in writing."

Said provision of the law was not complied with as to the National Surety Company, for no notice of appeal was served or filed reciting that it was from judgment on the pleadings in favor of said National Surety Company, therefore, the motion to dismiss the appeal is granted.

The appeal being dismissed as to the National Surety Company, it will only be necessary to consider the appeal from the order sustaining the motion for judgment notwithstanding verdict and the final judgment entered with reference to J. A. Fredrickson, the sheriff, and his sureties, and the Standard Accident Insurance Company, surety for Jesse H. Jackson, the deputy sheriff.

Appellants assign as error the action of the court in making and entering the order sustaining the motion for judgment notwithstanding verdict, and entering judgment of dismissal.

The grounds upon which the motions for judgment notwithstanding verdict were made, in substance are as follows: 1. That the complaint does not state facts sufficient to constitute a cause of action as against the movants. 2.

That the action was based upon the wrongful death statute, section 5–311, I. C. A., and recovery against the sureties could not be had under such statute. 3. That the evidence is insufficient to sustain the verdict against the respondents, in that: (a) "There is no evidence legally connecting Jackson," with the killing of Helgeson. (b) That at the time of the homicide Jackson was not acting by virtue of his office, and therefore the sheriff and his bondsmen are not liable.

Section 7–224, I. C. A., providing for judgment notwithstanding verdict, reads as follows:

"When, at the close of the testimony, any party to the action moves the court to direct a verdict in his favor, and such motion is denied, upon a subsequent motion that judgment be entered, notwithstanding the verdict, or notwithstanding the jury has disagreed and been discharged, the court shall grant the same if the moving party was entitled to such directed verdict. Such motion may be made at any time within ten days after the rendition of the verdict or disagreement and discharge of the jury. If such motion be granted, the order granting the same shall operate to vacate any judgment theretofore entered upon the verdict, and the judgment shall thereupon be entered accordingly."

Prior to the enactment of this statute a judgment *non obstante veredicto* was not permissible. (*Prairie Flour Mill Co. v. Farmers Elev. Co.*, 45 Ida. 229, 261 Pac. 673.) By the express provisions of the statute a judgment notwithstanding verdict, in favor of any party, cannot be entered unless at the close of the testimony such party to the action moves for a directed verdict in his favor, and the court is not permitted to grant the judgment *non obstante veredicto* unless the party moving for the directed verdict was entitled thereto.

It is claimed by appellants that the sufficiency of the complaint cannot be raised on a motion for judgment notwithstanding verdict, in that such motion can only challenge the sufficiency of the evidence to support the verdict. In *Ridley v. Portland Taxicab Co.*, 90 Or. 529, 177 Pac. 429, it is said:

"A motion for a directed verdict presents the same question for decision as does a motion for a judgment of nonsuit; but the plaintiff is of course entitled to the benefit, not only of his own evidence, but also to the benefit of any evidence favorable to him, though introduced by the defendant. . . . .

"A motion for a directed verdict, as well as a motion for an involuntary judgment of nonsuit, challenges the legal sufficiency of the evidence. Each of these motions performs the same function in connection with the evidence as does a demurrer in connection with a pleading; but neither of these motions is designed to perform the function of a demurrer to a pleading."

In *Mole v. Payne,* 39 Ida. 247, 227 Pac. 23, this court held:

"The insufficiency of the complaint cannot be raised by motion for nonsuit."

And in *Ludwig v. Ellis,* 22 Ida. 475, 126 Pac. 769, this court said:

"The insufficiency of the complaint is not a ground upon which a motion for a nonsuit may be based." (See, also, *Coulson v. Aberdeen-Springfield Canal Co.,* 39 Ida. 320, 227 Pac. 29; *Strong v. Western Union Telegraph Co.,* 18 Ida. 389, 109 Pac. 910, Ann. Cas. 1912A, 55, 30 L. R. A., N. S., 409.)

Therefore, the alleged insufficiency of the complaint was not a proper ground for sustaining the motion for judgment notwithstanding verdict.

It is also urged by the sheriff and his bondsmen, and the surety of Deputy Sheriff Jackson, that appellants are not entitled to recover under our wrongful death statute. Section 5–311, I. C. A., providing an action for wrongful death, reads as follows:

"When the death of a person, not being a minor is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death; or if such person be employed by another person who is responsible for his conduct, then also against such other person. In

every action under this and the preceding section, such damages may be given as under all the circumstances of the case may be just."

The section of the statute providing for the liability of the sheriff and his sureties for the acts of his deputy, section 57–812, I. C. A., provides:

"Every official bond executed by any officer pursuant to law is in force and obligatory upon the principal and sureties therein for any and all breaches of the conditions thereof committed during the time such officer continues to discharge any of the duties of or hold the office, and whether such breaches are committed or suffered by the principal officer, his deputy, or clerk."

And section 57–814, I. C. A., with reference to suits by persons injured, is as follows:

"Every official bond executed by any officer pursuant to law is in force and obligatory upon the principal and sureties therein to and for the state of Idaho, and to and for the use and benefit of all persons who may be injured or aggrieved by the wrongful act or default of such officer in his official capacity, and any person so injured or aggrieved may bring suit on such bond, in his own name, without an assignment thereof."

Respondents take the position that under the common law an action for injuries to the person of another, whether by assault and battery, false imprisonment, or other wrongful act, or by negligence, did not survive either the death of the person who inflicted or caused the injury, or the person injured, and that this is still the rule in this jurisdiction except in so far as it has been abrogated or modified by statutory provisions; that where there is no statute providing otherwise, causes of action *ex contractu* survive, while causes of action *ex delicto* do not. We are cited to *Kloepfer v. Forch*, 32 Ida. 415, 184 Pac. 477, wherein, in substance, it was stated that we have no statute abrogating the common-law rule of survival of causes of action for personal injury.

Respondents argue that the only action for wrongful death that can be maintained is by reason of section 5–311,

I. C. A., and that the action provided for therein is a new action, as compared to the action that might have been brought by the deceased had he lived; that pursuant to said section the action for damages will not lie except as against the person causing the death, or if such person be employed by another person who is responsible for his conduct, then also against such other person. Respondents seek to point out a clear distinction between the action for wrongful death statute of the various jurisdictions which contain a provision as follows: "Whenever the wrongful act would have entitled the person injured to maintain an action if death had not ensued," or words of similar import, which our statute does not have, pointing out that in those states where said special provision is found in the statute recovery thereunder is allowed as against a surety by reason thereof, but that under statutes such as ours the surety should not be held. In *Kloepfer v. Forch, supra,* relied on by respondents, this court expressly held that while the action was, in form, *ex delicto,* the cause was, in fact, *ex contractu,* and survived.

Our wrongful death statute was before the United States supreme court for construction in *Northern Pac. R. Co. v. Adams,* 192 U. S. 440, 24 Sup. Ct. 408, 48 L. ed. 513, and the construction therein placed on the statute was adopted by this court in *Sprouse v. Magee,* 46 Ida. 622, 269 Pac. 993, in which it was said:

"Under Lord Campbell's Act, the original model for all statutes giving a cause of action for so-called death by wrongful act, the act, neglect or default must have been such as would have entitled the party injured to maintain an action therefor if death had not ensued. (Tiffany on Death by Wrongful Act, 2d ed., sec. 61.) While this limitation or condition upon the maintenance of the action, is not included in the Idaho act, as said by that author, no case has been found in which it has not been implied. . . . .

"In construing the Idaho act, the supreme court of the United States, in *Northern Pacific Ry. Co. v. Adams,* 192 U. S. 440, 24 Sup. Ct. 408, 48 L. ed. 513, said of parties plaintiff in such action:

" 'They claim under him, and they can recover only in case he could have recovered damages had he not been killed, but only injured.' "

Thus it will be seen that by the construction this court has placed on said statute, it has the same force and effect, by implication, as if it expressly contained the provision, "Whenever the wrongful act would have entitled the person injured to maintain an action if death had not ensued."

In determining whether the action can be maintained against the sheriff and the respective sureties herein, the three sections of the statute, above quoted, must be construed and considered together, keeping in mind that the action against the deputy sheriff, Jackson, is an action *ex delicto*, while the action against the sureties is *ex contractu*, the latter needing no survival statute for death does not terminate its existence. In Tiffany on Death by Wrongful Act, 2d ed., sec. 118, p. 253, it is said:

"The action being maintainable, according to the terms of most of the statutes, whenever the act or neglect causing death was such that the party injured might have maintained an action, the question who may be sued will in general depend in each case upon precisely the same considerations that would govern in an action for personal injury. It has been held that the action could be maintained against the trustee or receiver of a corporation, against the master of a vessel, against the state, and against a municipality."

In *Coliseum Motor Co. v. Hester*, 43 Wyo. 298, 3 Pac. (2d) 105, the court said:

"The foundation of the action is the wrongful act of the defendant which resulted in death. No remedy existed at common law. The statute was intended to make a change. It is a survival statute in the sense that damages may now be recovered for the wrongful act, notwithstanding that death may result, whether instantaneously or otherwise. It gives a new cause of action for the same reason and for the further reason that the action is not one transferred from the decedent to the administrator but is one given directly to the administrator for the benefit of certain living relatives."

We feel there is no merit in the contention of respondents as to this question.

It is next contended by respondents that Deputy Sheriff Jackson had no right or authority to make any arrest except as expressly provided by our statutes. Section 19-603, I. C. A., reads as follows:

"A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person:

1. For a public offense committed or attempted in his presence.

2. When a person arrested has committed a felony, although not in his presence.

3. When a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it.

4. On a charge made, upon a reasonable cause, of the commission of a felony by the party arrested.

5. At night, when there is reasonable cause to believe that he has committed a felony."

It is admitted that the officers, Powell and Jackson, did not have a warrant for the arrest of Helgeson, but respondents contend that no facts or circumstances were called to the attention of the officers which would give them reasonable cause to believe that the party of whom the two girls complained to Jackson, had committed a felony on the night in question.

The court submitted to the jury, under appropriate instructions, the question as to whether there were sufficient facts and circumstances justifying Jackson to have reasonable cause to believe a felony had been committed, and that Helgeson, the deceased, had committed it. The respondents say, however, that there was no conflict in the evidence as to what the facts were, and the evidence being undisputed, that therefore it became the duty of the court, as a matter of law, to determine the question as to whether Deputy Sheriff Jackson had reasonable cause to believe that the deceased had committed a felony; and, consequently,

the court was right in vacating the judgment on the verdict, and should have granted the motion for a directed verdict. Respondents cite a number of our cases in support of their contention, which hold, in effect, that where the evidence is undisputed that the question as to what the fact is becomes a matter of law. Respondents also cite 38 C. J. 504, which we believe states the correct rule, as follows:

"Where the facts relied on as constituting probable cause are admitted or undisputed and only one inference can be drawn therefrom, the question of probable cause is solely for the determination of the court. In these circumstances, the existence of probable cause or the want of it is a pure question of law; and not only is the intervention of the jury not required, but it is erroneous to submit any phase of the question of probable cause to their determination. However, this rule does not apply where different inferences may be drawn from the evidence. In order that the rule may apply, it is essential that the inference to be drawn from the evidence should be free from doubt. If, on the undisputed facts, reasonable men might reach different conclusions as to whether facts amounting to probable cause exist, the existence of such facts is a question to be determined by the jury."

We believe that this court in *State v. Autheman*, 47 Ida. 328, 274 Pac. 805, 62 A. L. R. 195, quite distinctly stated the rule that is controlling in this case, as follows:

"The principal grounds urged by appellant for a reversal of the judgment are that the facts concerning the alleged reasonable cause for making the arrest without a warrant were undisputed; that the court should have determined the legality or illegality of the arrest as a matter of law, and erred in submitting the question to the jury. . . . .

"In one of the instructions, the jury was told when an officer may make an arrest without a warrant; they were informed of the meaning of 'reasonable cause,' and instructed that, if they found from the evidence that a charge had been made on reasonable cause of the commission of a felony by appellant, the arrest was legal; if they found

that a charge had not been made on such reasonable cause of the commission of a felony by appellant, the arrest was illegal. The definition of reasonable cause given the jury, about which no complaint is made, in effect, left the jury to determine' whether the officer was in possession of such information as would lead a man ·of ordinary care and prudence to believe, or entertain an honest and strong suspicion, that a felony had been committed by appellant; and if the jury found that the facts before the officer constituted reasonable cause, as a matter of fact, they were instructed, as a matter of law, that the arrest was legal and *vice versa.* It is a general rule, of course, that questions of law are for the determination by the judge, while questions of fact are for the jury. By permitting the jury to determine whether the officer was in possession of sufficient facts to constitute reasonable cause, the judge left the question of fact to the jury; and, by instructing that the arrest was legal, if such facts were present, but illegal if they were not, the judge decided the question of law in what appears to be the only practical method in a criminal case.''

The substance of what was said and done before Jackson started out to arrest Helgeson, has already been stated, and it could serve no useful purpose to give in detail the evidence on that point. Suffice it to say that we believe the evidence was such that reasonable men could draw different inferences from the evidence, and from what was said in *State v. Autheman, supra,* that question was properly submitted to the jury.

██ That the manner in which the officers attempted to make the arrest was unlawful calls for no argument. Section 19–608, I. C. A., provides:

''The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of the arrest, and the authority to make it, except when the person to be arrested is actually engaged in the commission of, or an attempt to commit, an offense, or is pursued immediately after its commission, or after an escape.''

Powell and Jackson did not comply with the law in arresting Helgeson, and the court was correct in instructing the jury that under the evidence there was no legal justification for Powell killing Helgeson.

If Jackson and Powell, at the time they attempted to make the arrest, did not have reasonable cause to believe Helgeson had committed a felony, then their acts in attempting to make the arrest were unlawful, and the court instructed that under such circumstances Jackson would be equally liable with Powell for any damage arising out of the shooting of deceased by Powell. But, on the other hand, if Jackson and Powell, at the time of making the arrest, did have reasonable cause to believe Helgeson had committed a felony, then their acts in attempting to arrest the deceased were lawful except wherein they did not comply with the provisions of section 19–608, I. C. A., above quoted. Respondents strenuously urge that Jackson did not do the shooting and did not have any reason to believe that Powell would shoot Helgeson, and that, therefore, he should not be held liable for Powell's unlawful act, and if that be true then Jackson's surety, as well as the sheriff and his bondsmen should not be held responsible. The law seems to be well settled, that where several people actively participate in any manner in the commission of a tort, not only the actual actor or assailant is liable but all others who aid, abet, counsel or encourage the wrongdoer by words, gestures, looks or signs are equally liable with him to the injured person. (5 C. J. 626; 1 Cooley on Torts, 4th ed., sec. 85, p. 273; 1 Sutherland on Damages, 4th ed., sec. 140, p. 432; *Bailey v. Idaho Irr. Co.*, 39 Ida. 354, 227 Pac. 1055; *Mitchell v. Hughes*, 104 Wash. 231, 176 Pac. 26; *Fisher v. Rumler*, 239 Mich. 224, 214 N. E. 310; *Williams v. Cape Fear Lbr. Co.*, 176 N. C. 174, 96 S. E. 950.)

Evidently the jury reached the conclusion that Powell and Jackson did not have reasonable cause to believe that the deceased, Helgeson, had committed a felony, for that is the only reasonable theory, under the record and instructions, by which the jury could have brought in a verdict against

the respondents. True, the court also instructed the jury, in substance, that if Jackson and Powell did have reasonable cause to believe that the deceased, Helgeson, had committed a felony then their acts in attempting to arrest the deceased were lawful up to the shooting and Jackson would not be liable for any damages arising out of the shooting of Helgeson by Powell unless the jury found from a preponderance of the evidence that he knew of and approved the purpose and intent of Powell to shoot and kill Helgeson. But upon a careful examination of the record we find no substantial evidence from which the jury could possibly find that Jackson knew of and approved the purpose and intent of Powell to shoot Helgeson.

The question then arises: Jackson not having any warrant to arrest Helgeson, or anyone else, and not having reasonable cause to believe that the deceased had committed a felony, can his surety and the sheriff and his bondsmen be held liable in damages for his unlawful act? We have already set forth the statute under which an officer may make an arrest. It is urged by respondents that because Powell and Jackson did not have any warrant to arrest Helgeson or anyone else at the time in question, and if they did not have reasonable cause to believe that the deceased had committed a felony, then they were not acting by virtue of their office in making the arrest and their acts were the same as that of private individuals, for which the sheriff and the sureties are not responsible. Respondents seek to draw a distinction between acts done by virtue of office and acts done under color of office. It is admitted by the parties that if the acts done by the officers in this case were by virtue of their office, but improperly performed, and such improper acts caused the death of Helgeson then the sheriff and the respective sureties would be liable. But respondents say that the acts of the officers causing the death of Helgeson were not by virtue of their office, but merely under color of office.

In *Haffner v. United States F. & G. Co.*, 35 Ida. 517, 207 Pac. 716, this court said:

"Acts done *'virtute officii'* are those within the authority of the officer, when properly performed, but which are performed improperly; acts done *'colore officii'* are those which are entirely outside or beyond the authority conferred by the office."

Respondents rely principally on our own decision, *Federal Reserve Bank v. Smith,* 42 Ida. 224, 244 Pac. 1102, in which this court approved the distinction between acts done by virtue of office and acts done under color of office as stated in *Haffner v. United States F. & G. Co., supra,* and then said:

"It is generally held that to constitute color of office such as will render officers liable on their official bonds for their unauthorized acts, something else must be shown besides the fact that the officer claimed to be acting in his official capacity in doing the act complained of. If not armed with a writ, or if the writ under which he acts is void on its face and there is no statute which authorizes the act to be done without process, then there is no such color of office as will impose a liability upon the sureties on his official bond. (*Chandler v. Rutherford* [101 Fed. 774], *supra.*)

" 'It is only such acts of a sheriff as are done under color of office, involving an abuse, as distinguished from a usurpation, of authority, that render his bondsmen liable.' (*State v. Dierker,* 101 Mo. App. 636, 74 S. W. 153 (Syl.).''

In addition to our cases the respondents cite a number of cases from other jurisdictions supporting the same view. Appellants urge most strenuously that the trend of modern decisions and the great weight of authority hold contrary to the rule thus announced, and in this respect we believe appellants' contention is correct.

In 24 R. C. L. 965, sec. 59, it is stated:

"But according to many of the cases it is clear that the authority of an officer to do a particular act is not the proper criterion of his liability, for the very simple reason that the basis of liability in every instance is want of authority, whether exercised under process or not; and so it is held to be rather incongruous that the rule should be relaxed in

so far as the liability of an officer's sureties are concerned, where the officer goes to the extreme of acting in an apparently official capacity without any process whatever. The test should be: Would he have acted in the particular instance if he were not clothed with his official character, or would he have so acted if he were not an officer? If he assumed to act as an officer—whether under valid or void process, or under no process whatever—the bondsmen should be held, as he is held, for they are the sponsors of his integrity as an officer while acting as such. They should not be absolved from liability for reasons which if carried to their logical extreme would make them responsible only for legal or authorized acts (where of course there is no liability) and excuse them from liability where acts are in excess of or apart from his authority—the very acts which they are supposed to assure against and which constitute the only logical contingency for entering upon their obligation as sureties. Under such a test as this, it is clear that the distinctions drawn out at interminable length in the authorities as between acts *virtute officii* and acts *colore officii* would be deemed of little if any use in practice inasmuch as, from their very nature, they are mere argumentations in a circle. Hence the opposite rule prevails in many jurisdictions."

In the very recent case of *Abbott v. Cooper,* 218 Cal. 425, 23 Pac. (2d) 1027, the California court said:

"It is not contended by any party to the action that said arrests were made upon a warrant of arrest, or for a crime committed in the presence of said arresting officers, or that plaintiff was delivered to said jailers upon the authority of a *mittimus,* or that any declaration was made to the jailer by said officers that plaintiff had committed a crime in the presence of either of said arresting officers, which declaration may satisfy the law or take the place of a *mittimus.* On the contrary, when the jailer inquired as to the charges made against Abbot, Carson replied: 'Damned if I know. Damned if I believe he is allowed out in the county.' He finally decided that plaintiff should be kept in

jail overnight, and his fate left to the decision of the sheriff upon his arrival at a later hour. It is admitted that the acts of the jailer in detaining plaintiff in prison were unauthorized and unlawful, but it is the contention of respondents that the jailer's conduct was so patently unwarranted as to have amounted to conclusive proof that he knew that he was committing a trespass in detaining plaintiff in the circumstances of plaintiff's delivery to him, and therefore, as he was not acting under color of his office, his principal and the surety are not liable. We cannot subscribe to this doctrine, as it would tend to excuse or mitigate the wrongful acts of the officer if said acts were accompanied by unusual acts of oppression or amounted to a flagrant abuse of official duty, and penalize the offender only when his acts were less culpable. The fallacy of respondents' argument is well met in *Clancy v. Kenworth,* 74 Iowa, 740, 35 N. W. 427, 428, 7 Am. St. 508, and by many other decisions spread throughout the states which adopt the reasoning of the Iowa court, from which we quote: 'But it is insisted that, as the constable is shown to have had no lawful authority to arrest plaintiff, his act was therefore not done in the line of his duty. In truth his act was in the line—direction—of official duty, but was illegal because it was in excess of his duty. In the discharge of official functions he violated his duty, and oppressed the plaintiff. This is all there is of it. If, in exercising the functions of his office, defendant is not liable for acts because they are illegal or forbidden by law, and for that reason are trespasses or wrongs, he cannot be held liable on the bond at all, for the reason that all violations of duty and acts of oppression result in trespasses or wrongs. For lawful acts in discharge of his duty he of course is not liable. It follows that, if defendant's position be sound, no action can be maintained upon the bond in any case. In support of our conclusions, see *Tieman v. Haw,* 49 Iowa, 312.' "

In the case of *Lee v. Charmley,* 20 N. D. 570, 129 N. W. 448, 449, 33 L. R. A., N. S., 275, it was said:

"The almost uniform current of the later cases, however, regards wrongful acts of a public officer *colore officii* as official acts for which the sureties upon his bond are liable. Such is the holding of the courts of last resort of Pennsylvania, Maine, Massachusetts, Ohio, Virginia, Kentucky, Missouri, Iowa, Nebraska, Texas, California, Minnesota, Illinois, and of the Supreme Court of the United States. And in reviewing these authorities this court in one of its former opinions has remarked: 'While there is a dispute among the authorities whether the sureties on a sheriff's bond are liable for the wrongful act of their principal in seizing property of a third person, the more numerous decisions are found arrayed in support of the rule that they are liable and these cases appear to us to have the best of the argument. See *Lammon v. Feusier*, 111 U. S. 17, 4 Sup. Ct. 286, 28 L. ed. 337, where the authorities are reviewed and where the doctrine we deem sound is enunciated.' "

In *Hall v. Tierney*, 89 Minn. 407, 95 N. W. 219, the court said:

"In earlier days a very marked distinction was made in actions brought upon official bonds between acts done by the principal *virtute officii*, defined as those within the limits of his authority, but which he had performed improperly, and for which his sureties were liable, and acts done *colore officii*, defined as acts of such a character that his office gave him no authority to perform, and for which his sureties were not liable. And this attempted distinction led to very much refinement and fanciful reasoning by the courts, as will be seen upon examining the authorities. . . . .

"The distinction originally made between acts done by virtue of an office and acts done by color of office has been entirely disregarded by leading authorities within the past few years. . . . . 'The object of an official bond is to obtain indemnity against the misuse of an official position for wrong purposes; and that which is done under color of office, and which would obtain no credit except for its appearing to be a regular official act, is within the protection

of the bond, and must be made good by those who signed it.' Murfree, Official Bond, sec. 211.''

In *Jahns v. Clark*, 138 Wash. 288, 244 Pac. 729, the court made this statement:

''But the contention is that Thomas' act, being a trespass *ab initio*, was not a lawful act, and not within the scope of his employment, and therefore was an act for which the sheriff and his surety are not liable. Section 4157, Rem. Comp. Stat., provides the duties of a sheriff, among which is the duty to arrest all persons guilty of public offense. It is the sheriff's duty, to be exercised either in person or through his deputies, to arrest bootleggers. By section 4160 the sheriff is given the power to appoint deputies, 'for whose official acts he shall be responsible to the amount of his bond.' *Coles v. McNamara*, (131 Wash. 377, 230 Pac. 430) *supra*. By section 4155 the sheriff's official bond is provided for; the condition of the bond being that the sheriff shall faithfully perform all the duties of his office. The argument of these appellants is that Thomas committed a wrong, but it was not an 'official' one. In behalf of this argument discussion is had of the difference between acts done under color of office or by virtue of the office, and the ancient distinction between *colore officii* and *virtute officii* is refurbished and attractively presented. Courts long ago, however, have ceased to view with much tolerance this distinction when liability for unwarranted acts on the part of peace officers is attempted to be evaded by their superior and his sureties, for, as has often been pointed out, if this distinction is carried to its legitimate conclusion, there would never be any liability but his own for the wrongful act of a subordinate peace officer. To recognize such a distinction would be to establish a rule which this court in *Greenius v. American Surety Co.*, 92 Wash. 401, 159 Pac. 384, L. R. A. 1917F, 1134, has already said is neither workable nor sensible.''

Many additional citations could be given of similar import. We believe that the great weight of authority and the more modern decisions state the better rule: That it is

immaterial whether the officer was acting by virtue of his office or under color of office, the surety is bound for his acts.

The true test in this case is: Would Jackson and Powell have acted in this particular instance if they had not been officers of the law? If Jackson had not been a deputy sheriff and Powell a police officer certainly neither would have attempted to arrest Helgeson. They went to arrest him because they were officers with stars and guns, and they were no more wrongdoers in shooting Helgeson than if they had had a warrant for his arrest and then unlawfully shot him. In either case they would have exceeded their authority. Bondsmen are sponsors for the integrity of the officers while acting as such, and in this instance Jackson and Powell were acting as officers; they would not have been there as individuals. To hold thus is both reasonable and just, but to hold otherwise would be contrary to what was clearly contemplated under the surety's bond.

Appellants have put forth considerable effort to distinguish *Haffner v. United States F. & G. Co., supra,* and *Federal Reserve Bank v. Smith, supra,* from the case at bar. We do not believe that a real distinction exists, but we feel that those cases are contrary to the more modern and just rule and great weight of authority; that the rule therein stated prevents justice. Therefore, in so far as they are contrary to the rule herein announced, they are hereby expressly overruled.

From what has been said, under section 57–812, I. C. A., and *Price v. Pace,* 50 Ida. 353, 296 Pac. 189, the sheriff and his sureties are liable for the misconduct of the deputy sheriff, Jackson, and the surety for Jackson is also responsible. The judgment of the lower court is reversed with directions to reinstate the original judgment.

Costs awarded to appellants.

Budge, C. J., and Morgan, J., concur.

GIVENS, J., Concurring Specially.—I concur in the conclusion reached, but not in the portion of the opinion over-

ruling *Haffner v. United States F. & G. Co.,* 35 Ida. 517, 207 Pac. 715, and *Federal Reserve Bank v. Smith,* 42 Ida. 224, 244 Pac. 1102, because I think those cases are distinguishable from the situation herein and capable of being harmonized thus: *Haffner v. United States F. & G. Co., supra,* considered venue not liability, and while "virtue" and "color" are contrasted, no decisive holding was necessary or made therein as to liability, only as to a cause of action coming under section 5–402, I. C. A., formerly section 6662, I. C. S., 1919.

In *Federal Reserve Bank v. Smith, supra,* the court said: " 'It is only such acts of a sheriff as are done under color of office, involving an abuse, as distinguished from a usurpation, of authority, that render his bondsmen liable,' " and here there was such abuse as to render the bondsmen liable and such holding, would not, it seems to me, be out of line with the holding in *Federal Reserve Bank v. Smith, supra.*

HOLDEN, J., Dissenting.—At about eleven o'clock at night, April 25, 1932, two young ladies stopped at the house of Deputy Sheriff Jackson, where the following conversation occurred:

"Q. What did you do?

"A. Went on the porch.

"Q. Did he come out?

"A. After I knocked and asked if I could speak to him for a minute.

"Q. Yes. And what was the conversation between you and Mr. Jackson?

"A. When he came out on the porch, I pointed this man out to him.

"Q. How far away was this man at that time?

"A. Maybe a little better than half a block.

"Q. What was he doing then?

"A. He was coming down the sidewalk.

"Q. In which direction?

"A. West.

"Q. Towards you?

"A. Yes sir.

"Q. Now, what was the conversation between you and Mr. Jackson?

"A. He asked me what the trouble was, and I told him it was too terrible to tell.

"Q. Did you say anything about someone accosting you? By that, I mean someone making some comment to you or speaking to you?

"A. No sir, I just pointed him out.

"Q. What did you say when you first went up to Mr. Jackson, when he first came out on the porch?

"A. I told him that man was following us.

"Q. What did he say?

"A. He asked me what the trouble was.

"Q. And what did you say?

"A. I told him it was too terrible to tell.

"Q. And what did he say?

"A. He told me to go home, and he would follow him."

Following that conversation the deputy sheriff then went to see Powell, a police officer at St. Anthony, whereupon Powell asked Jackson what the man had done, referring to some man who had, the young ladies said, been following them, to which question the deputy sheriff replied: "I don't know." The following question was asked Powell ·as to what Jackson told him, after Officers Jackson and Powell got to the point near which Powell shot and killed the deceased, but before Powell fired the fatal shot, and Powell made the following reply:

"Q. What did he tell you, if anything, about it?

"A. He said he was driving around the block to meet me coming with the fellow, and he said he heard one or two shots."

The only actual, definite information, then, that Jackson had to act upon, was, that some man had been following the young ladies, notwithstanding the fact that one of the young ladies, when Jackson asked "what the trouble was," replied "it was too terrible to tell." That the officer

himself did not believe that a felony had been committed by the man coming down the sidewalk toward him, is placed beyond serious controversy by the fact that all he would have had to do was to just wait for a moment or two and then step off his porch, and in the very presence of the young ladies, arrest the man; in other words, if Jackson had had reasonable cause for believing that a felony had been committed, or that the man coming down the sidewalk toward him had done something "too terrible to tell," who can doubt that Jackson would have instantly and eagerly started toward that man to arrest him. And that Jackson did not know what, if anything, the man had done, other than to follow the young ladies, is further and convincingly shown by the fact that when Powell asked him what the man had done, he replied: "I don't know."

Section 19–603, I. C. A., provides when a peace officer may arrest as follows:

"A peace officer may make an arrest in obedience to a warrant delivered to him or may, without a warrant arrest a person:

"1. For a public offense committed or attempted in his presence.

"2. When a person arrested has committed a felony, although not in his presence.

"3. When a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it.

"4. On a charge made, upon a reasonable cause, of the commission of a felony by the party arrested.

"5. At night, when there is reasonable cause to believe that he has committed a felony."

Officer Jackson did not have a warrant for the arrest of anybody, and no felony was committed in his presence or otherwise, so that if he had any authority, or right, whatsoever, to act as a peace officer, and make an arrest, it could only arise from evidence showing reasonable cause for believing that the deceased had committed a felony. And

if following two young ladies in the evening, without harming, or insulting or even speaking to them, constitutes a felony, then Officer Jackson had reasonable cause for believing that a felony had been committed, but even at that, the deputy sheriff had no reasonable cause; in fact, no reason whatever, for believing that the deceased had been following the young ladies, or had annoyed them in any way, or had committed a felony, or that he was guilty of any wrongdoing whatever. Under subdivision No. 3, of the above-quoted section, Jackson must have had reasonable cause for believing: First, that a felony in fact had been committed, and, secondly, that the deceased committed it. And the test in determining whether Jackson had reasonable cause for believing, first, that a felony had been committed, and, secondly, that the deceased committed a felony, is, whether a reasonable and ordinarily prudent man, placed in the same situation that Jackson was in, would have believed that both a felony had been committed and also that the deceased committed it. Subjected to that test, it is at once apparent that the evidence is insufficient to prove that Jackson had reasonable cause for believing either that a felony had been committed, or that the deceased committed it. In fact, the circumstances related to Jackson by one of the young ladies, constituted no evidence whatever of the commission of any crime by the deceased, nor did such circumstances create a reasonable suspicion that the deceased had even followed or spoken to the ladies.

The terms of the official bond of Sheriff Fredrickson were:

"Shall well, truly and faithfully perform all the duties of his office now required of· him by law, and also such additional duties as may be hereafter imposed upon him by any· law enacted and in force in the State of Idaho."

There has always been a conflict of authorities as to when a surety upon an official bond is liable for the acts of his principal. In *Federal Reserve Bank v. Smith*, 42 Ida. 224, 244 Pac. 1102, this court was called upon to determine whether it would follow that line of authorities holding

that a surety is liable for the acts of his principal, or his deputies, done under color of office, or the line of authorities holding that a surety is not so liable, and this court, after reviewing the authorities, and after full and careful deliberation, chose to follow the line of authorities holding that the surety is not liable, as quite clearly appears from the following excerpt:

"The authorities are in conflict as to whether a surety upon an official bond is liable for acts of the principal, or his deputies, done *colore officii*, many courts holding that the surety in such case is liable (24 R. C. L. 965, 966; *Skagit County v. American Bonding Co.*, 59 Wash. 1, 109 Pac. 197; *Lee v. Charmley*, 20 N. D. 570, 129 N. W. 448, 33 L. R. A., N. S., 275; *Greenberg v. People*, 225 Ill. 174, 80 N. E. 100, 116 Am. St. 127, 8 L. R. A., N. S., 1223; *Turner v. Sisson*, 137 Mass. 191), while others take the position that the surety is not liable for such acts. (*Inman v. Sherrill*, 29 Okl. 100, 116 Pac. 426; *People v. Pacific Surety Co.*, 50 Colo. 273, 109 Pac. 961, Ann. Cas. 1912C, 577; *Gray v. Noonan*, 5 Ariz. 167, 50 Pac. 116 (118); *Jones v. Van Bever*, 164 Ky. 80, 174 S. W. 795, L. R. A. 1915E, 172; *State v. Schaper*, 152 Mo. App. 538, 134 S. W. 671; *Gold v. Campbell*, 54 Tex. Civ. App. 269, 117 S. W. 463; *Chandler v. Rutherford*, 101 Fed. 774, 43 C. C. A. 218.)

"This court, in *Haffner v. United States F. & G. Co.*, 35 Ida. 517, 207 Pac. 716, lays down the distinction between acts done by virtue of office and acts done under color of office:

"'Acts done *"virtute officii"* are those within the authority of the officer, when properly performed, but which are performed improperly; acts done *"colore officii"* are those which are entirely outside or beyond the authority conferred by the office.'

"It is generally held that to constitute color of office such as will render officers liable on their official bonds for their unauthorized acts, something else must be shown besides the fact that the officer claimed to be acting in his official

capacity in doing the act complained of. If not armed with a writ, or if the writ under which he acts is void on its face and there is no statute which authorizes the act to be done without process, then there is no such color of office as will impose a liability upon the sureties on his official bond.''

If Jackson acted when no felony had, in fact, been committed, as the evidence conclusively shows, and in the absence of reasonable cause for believing that the deceased had committed a felony, as the evidence further conclusively shows, then the sureties, under the terms of their official bond hereinbefore quoted, would not be liable. In the light of those undisputed facts, it becomes clear that the majority opinion holds the sheriff's sureties liable for the killing of the deceased, because Jackson happened to be a deputy sheriff at the time of, and to some extent, perhaps, participated in, the killing.

The rule of *stare decisis* requires that this court adhere to *Federal Reserve Bank v. Smith, supra; Inman v. Sherrill, supra;* 15 Corpus Juris, 916, sec. 304, and cases therein cited.

For the reasons above stated, I cannot concur in the majority opinion.