(Nos. 7065 and 7066. January 2, 1943.)

MARTIN JACOBSON, Appellant, v. S. J. McMILLAN, THE AETNA CASUALTY AND SURETY COMPANY, a corporation, JAMES O. CROMWELL and NATIONAL SURETY CORPORATION, a corporation, Respondents.

GEORGE SABLACK and ANNA SABLACK, Appellants, v. S. J. McMILLAN, THE AETNA CASUALTY AND SURETY COMPANY, a corporation, JAMES O. CROMWELL, and NATIONAL SURETY CORPORATION, a corporation, Respondents.

[132 Pac. (2d) 773.]

W. F. McNaughton, Wm. S. Lee and J. H. Felton for appellants.

Whitla & Knudson and J. Ward Arney for respondents.

AILSHIE, J.—In July, 1940, Grace Wark O'Connor was living separate from her husband, Dan O'Connor, at Rathdrum. Being apprised of her husband's intention to shoot her and other members of her family, Mrs. O'Connor took refuge in the residence of C. F. Hess. While attempting to protect Mrs. O'Connor, Hess was assaulted by O'Connor discharging a loaded gun at him. August 10, 1940, Hess filed a criminal complaint against O'Connor and the latter was arrested by Sheriff McMillan and taken before the probate judge of Kootenai county. After a preliminary hearing, August 27th, and by regular commitment, O'Connor was taken into custody and confined in the county jail. September 7th, information, charging O'Connor with assault by a deadly weapon, was filed in the district court by the prosecuting attorney; no trial was held and no bond furnished for O'Connor's release; and the order of commitment has never been rescinded nor had O'Connor been legally discharged. It appears that O'Connor was suffering from a mental and physical disease known as paresis, which "rendered him mentally deranged and dangerously insane."

September 25, 1940, Sheriff McMillan caused a deputy to take the prisoner out of the county and deliver him to defendant Cromwell, as superintendent of the State Hospital South at Blackfoot; that Superintendent Cromwell undertook to detain the prisoner, to make observations as to his mental and physical condition, and to return him to Sheriff McMillan. The material charging part of the complaint is set out at length in the footnote.[1]

---

[1] "that, as the defendant S. J. McMillan then and there well knew

Plaintiff Jacobson was employed by Mrs. O'Connor to perform manual labor "and, as said Dan O'Connor well knew, to furnish her and her family with protection against

or in the exercise of reasonable care ought to have known, said Dan O'Connor at all times herein mentioned was possessed of homicidal intentions toward his wife, Grace Wark O'Connor, and the members of her family and toward any person, including the plaintiff, who should attempt to intervene for the purpose of protecting said Grace Wark O'Connor and the members of her family from a felonious assault by Dan O'Connor, and that such homicidal intentions were the uncontrollable impulses resulting from a mental and physical disease known as paresis which rendered him mentally deranged and dangerously insane; that, as the defendant S. J. McMillan then and there well knew, or in the exercise of reasonable care ought to have known, the said Dan O'Connor intended to shoot Grace Wark O'Connor, the members of her family, and any person, including the plaintiff, who should attempt to protect her and the members of her family from said Dan O'Connor, if and when an opportunity presented itself.

### VII

"That thereafter, to-wit: on the 25th day of September, 1940, in violation of said order of commitment then in force and effect, the said defendant S. J. McMillan carelessly, negligently, and unreasonably relieved said Dan O'Connor of his detention in the Kootenai County jail and caused his deputy Walter Cox to take such prisoner out of Kootenai County and to deliver him to the defendant James O. Cromwell as superintendent of the State Hospital South at Blackfoot, Idaho, on the 26th day of September, 1940.

### VIII

"That the defendant James O. Cromwell then and there, and in his official capacity, received the said Dan O'Connor and placed him within the confines and detention of said State Hospital; that on the said 26th day of September, 1940, and at all times thereafter the only order or writ under which the said Dan O'Connor was confined was the order of commitment heretofore described as being issued by the said Honorable M. G. Whitney as Probate Judge on the 27th day of August, 1940, directing that Dan O'Connor be held and detained upon the charge of assault with a deadly weapon; and that the said defendant James O. Cromwell explicitly undertook to detain such prisoner and make observations as to his mental and physical condition and then to return him to the defendant S. J. McMillan to be held in the Kootenai County jail for trial or other proceedings in accordance with law; and that the said defendant James O. Cromwell

the said Dan O'Connor." May 3, 1941, O'Connor, having secured a 12-gauge shotgun, proceeded to the residence of his wife and her family near Cataldo, Shoshone county, and

was informed of the fact that Dan O'Connor was in the possession of S. J. McMillan as sheriff of Kootenai County on the charge of assault with a deadly weapon and of the assault hereinbefore mentioned upon C. F. Hess; and that said defendant James O. Cromwell then and there well knew, or in the exercise of reasonable care ought to have known, that said Dan O'Connor was possessed of homicidal intentions toward his wife, Grace Wark O'Connor, and the members of her family, and any person, including the plaintiff, who should attempt to protect her and her family from a felonious assault by Dan O'Connor, and also that such homicidal intentions and desires were the uncontrollable impulses resulting from a serious mental and physical disease known as paresis which rendered him mentally deranged and dangerously insane, and that he intended to shoot and would shoot Grace Wark O'Connor, the members of her family, and any person, including the plaintiff, who should attempt to protect her and the members of her family from a felonious assault by said Dan O'Connor, if and when said Dan O'Connor obtained an opportunity;

IX

"That thereafter, to-wit, on or about the first day of December, 1940, the defendant James O. Cromwell carelessly, negligently and unreasonably and in wanton disregard of the well being of the plaintiff and Grace Wark O'Connor and her family, and in violation of his duties as medical superintendent of the State Hospital South, permitted the said Dan O'Connor to wander freely without guard or supervision, to leave the confines of the State Hospital South, and to take himself beyond restraint; and thereafter the defendants S. J. McMillan and James O. Cromwell, having it within their power to apprehend the said Dan O'Connor, and take him back into custody, carelessly, negligently, and wantonly permitted the said Dan O'Connor to remain at large and made no effort to apprehend him or to restrain him from his homicidal intentions and insane impulses, contrary to the proper and valid order of commitment as aforesaid; that various persons thereafter notified the defendant S. J. McMillan that Dan O'Connor was at large in Kootenai County and that the said defendant S. J. McMillan carelessly and negligently and in breach of duty made no attempt to apprehend him, although it was within his power to have done so;

X

"That the plaintiff was at all times mentioned herein an employee of said Grace Wark O'Connor and that his duties were to perform

began shooting, thereby wounding Jacobson and causing him pain and suffering, and killing John Sablack.

Two separate actions were filed April 10, 1942: One by plaintiff Jacobson, praying for damages against defendants, S. J. McMillan and his surety, Aetna Casualty and Surety Company, and James O. Cromwell, superintendent of the State Hospital South, and his surety, National Surety Corporation, for wounds and injuries to plaintiff as the proximate result of negligence by the sheriff and superintendent, and violation of the order of commitment of said O'Connor; the other action was for the killing of Sablack under the same circumstances and at the same time and place as Jacobson was injured.

Separate demurrers were filed by each of the parties to amended complaints. Demurrers were both general and special, alleging (1) that facts stated do not constitute a cause of action; (2) that there was a misjoinder of parties defendant; (3) that the complaint was ambiguous, indefinite, and uncertain; and further setting out special defects directed to the insufficiency of the complaint.

The court entered separate orders July 2, 1942, sustaining the demurrers and giving plaintiff ten days to further plead or amend the complaint. Thereafter, on application of counsel for defendants, plaintiff having failed to file an amended complaint or to further plead in the action, judgment of dismissal with prejudice was entered. From the judgments of dismissal and from the orders sustaining demurrers, this appeal is taken.

---

manual labor for the said Grace Wark O'Connor and, as said Dan O'Connor well knew, to furnish her and her family with protection against the said Dan O'Connor;

### XI

"That, as a proximate result of the negligence and violation of the order of commitment hereinbefore referred to, on the 3rd day of May, 1941, the said Dan O'Connor, acting under insane and uncontrollable impulses, possessed himself of a shotgun and proceeded to the residence of Grace Wark O'Connor and her family and of the plaintiff near Cataldo, in Shoshone County, Idaho, and began to shoot at them, and did, with said shotgun, at such time and place shoot the plaintiff causing about thirty large size lead shot to enter his legs between the hips and the ankles and severely wounding him and causing him pain and suffering and damage to the extent of $25,000.00 as hereinafter more specifically set forth."

An analysis of paragraph 10 of appellant's complaint convinces us that appellant undertook, for hire, the risk, from the results of which he now complains. He alleges:

"That the plaintiff was at all times mentioned herein an employee of said Grace Wark O'Connor and that his duties were to perform manual labor for the said Grace Wark O'Connor and, as said Dan O'Connor well knew, to furnish her and her family with protection against the said Dan O'Connor."

The foregoing is immediately followed by the allegation: "That, as a proximate result of the negligence and violation of the order of commitment hereinbefore referred to, .... the said Dan O'Connor, acting under *insane and uncontrollable impulses,* possessed himself of a shotgun and proceeded to the residence of Grace Wark O'Connor .... and began to shoot at them, and did, with said shotgun, at such time and place shoot the plaintiff."

It is clear from the complaint, that appellant was apprised and knew of O'Connor's affliction with homicidal insanity; and that he knew that O'Connor was "mentally deranged and dangerously insane"; and that the assault was the result of "uncontrollable impulses." He further alleges that O'Connor "intended to shoot and would shoot Grace Wark O'Connor, the members of her family, *and any person, including the plaintiff, who should attempt to protect her* and the members of her family from a felonious assault by said Dan O'Connor." Possessed of such knowledge, appellant took employment and voluntarily placed himself in a position, subjecting himself to any attack that might be made by O'Connor. In cases of personal injury, the law looks to the *proximate* and not the *remote* cause. (*Oakland Bank of Savings v. Murfey et al.,* 68 Cal. 455, 9 P. 843, 847; 62 C. J., p. 1115, sec. 30.) The proximate cause of appellant's injuries was his acceptance of employment, going to and remaining at the place when and where he knew the offense was likely to be committed, if at all. Here the proximate and remote cause concurred at one and the same time and resulted in the tragedy. In the absence of either one, the assault would not have occurred. Respondents were in no way responsible for appellant's presence at the home of Grace Wark O'Connor and neither directly nor indirectly subjected appellant to the danger from which he suffered.

When read and examined in a practical way, it

seems clear that the sheriff received this prisoner under commitment from the probate court to await trial on the charge of assault with a deadly weapon. As to what, if any, order was made by the district court, in relation to O'Connor's custody, *after filing of the information* by the prosecuting attorney, does not appear. It is quite apparent that the sheriff, acting in good faith, sent O'Connor to the hospital at Blackfoot *for the purpose of observation, examination and any possible treatment,* and with a view to discharging his duty toward both the prisoner and the public as well. (*Kusah v. McCorkle,* 100 Wash. 318, 170 P. 1023, 1025, L.R.A. 1918C, 1158.) In *Cornell v. Mason,* 46 Ida. 112, this court sustained a judgment of ouster under sec. 19-4215, I. C. A., against a sheriff for willful neglect of duty, and held that *"bad faith" must be shown in such cases.* While the commitment required the sheriff to safely keep the prisoner until he was ordered otherwise by the court, it was also his duty to safeguard the prisoner and protect his health, both mentally and physically, in so far as he could do so. The duties of a peace officer, who has custody of a prisoner, are two-fold, (1) to the public and (2) to the prisoner. (*Kusah v. McCorkle,* supra; *McPhee v. U. S. F. & G. Co.,* 52 Wash. 154, 100 P. 174, 175, 132 Am. St. 958; *Riggs v. German,* 81 Wash. 128, 142 P. 479, 480.) Under such circumstances, he owes no more duty to one member of the public than to another. (*Yaselli v. Goff,* 12 F. (2d) 396, 404, 56 A. L. R. 1239, 1250; affirmed, 275 U. S. 503, 72 L. ed. 395; 43 Am. Jur., sec. 272, p. 84.)

■ Any violation on the part of the sheriff, of his duty to keep a prisoner charged with a crime, is answerable to the public; and he is subject to indictment or information for removal from office, for wilful, negligent violation of such duty. (Sec. 19-4215, I. C. A.; *Corker v. Pence,* 12 Ida. 152, 160, 85 P. 388.) That right, however, does not inure to individuals. (*Worden v. Witt,* 4 Ida. 404, 407, 39 P. 1114, 95 Am. St. 70; *McPhee v. U. S. F. & G. Co.,* supra; *South v. State,* 15 L. ed. 433, 435.) It rests with the public and must be exercised by the prosecutor or a proper party on behalf of the state. (Secs. 19-4201-19-4215, I. C. A.; *Ponting v. Isaman,* 7 Ida. 283, 286, 62 P. 680; *Archbold v. Huntington,* 34 Ida. 558, 565, 201 P. 1041; see, also, *Rankin v. Jauman,* 4 Ida. 53, 36 P. 502; *Walton v. Channel,* 34 Ida. 544, 204 P. 665.)

In *Worden v. Witt,* supra, Justice Huston quoted with approval from Cooley's work on Torts as follows:

" '. . . . if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual, injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages.' "

In *South v. State of Maryland,* 15 L. ed. 433, 435, the supreme court of the United States has said:

"The powers and duties . . . . exercised by the sheriff are not strictly judicial; but he may be said to act as the chief magistrate of his county, wielding the executive power for the preservation of the public peace. *It is a public duty, for neglect of which he is amenable to the public, and punishable by indictment only."* (Italics supplied.)

An individual may have a civil action against the officer for failure to serve civil or quasi-civil process or for any malfeasance or misfeasance in the discharge of his official duty in the execution of civil process coming to his hands. (57 C. J., p. 804, sec. 206.)

A different situation appears with reference to respondent Cromwell as asylum superintendent. So far as he is concerned, the complaint alleges that he received the prisoner "and explicitly undertook to detain such prisoner and make observations as to his mental and physical condition and then to return him to the defendant S. J. McMillan to be held in the Kootenai County jail for trial. . . . ." The complaint shows this was a personal understanding and agreement between the sheriff and the superintendent made for the benefit primarily of the prisoner. It was not an agreement between the officers and appellant. Apparently the superintendent received no order or process for holding the prisoner, though he may have been justified in receiving him, under the provisions of chap. 151, sec. 1, 1939 Sess. Laws. It does not appear, however, that he could have in any way anticipated that O'Connor would escape and travel some 600 miles from Blackfoot to Cataldo and commit the offense of which appellant complains; nor does it appear that the superintendent had the legal authority to detain him unless it may have been acquired under the provisions of chap. 151, sec. 1, supra.

While the complaint charges that the respondents, McMillan and Cromwell, failed to detain O'Connor in prison or confinement and "wantonly permitted the said O'Connor to remain at large . . . .", *no facts or circumstances are alleged* that would in any way indicate or from which an inference could be drawn, that their conduct was "wanton", i. e., "a reckless disregard for the safety of others." Cases arising out of failure to protect a prisoner from a mob: (*Asher v. Cabell*, 1 C. C. A. 693, 2 U. S. App. 158, 50 Fed. 818; Ex parte Jenkins, 25 Ind. App. 532, 58 N. E. 560, 81 Am. St. R. 114) or injury to prevent escape (*Thomas v. Kinkead*, 55 Ark. 502, 15 L. R. A. 558, 29 Am. St. R. 28, 18 S. W. 854; *Brown v. Weaver*, 76 Miss. 7, 42 L. R. A. 423, 71 Am. St. R. 512; 23 So. 388) ; or injury in making arrest, (*Helgeson v. Powell*, 54 Ida. 667, 34 P. (2d) 957) ; or failure to hold prisoner for debt (*Gural v. Engle*, 128 N. J. L. 252, 25 A. (2d) 257, 262) rest upon an entirely different basis and principle of personal responsibility from that here involved.

The acts of the sheriff and the superintendent, in permitting O'Connor to escape and be at large, were only a remote cause in comparison with the negligence of appellant, which could not have been reasonably foreseen or anticipated by either of respondents; whereas, appellant (according to his complaint) had every reason to believe that he would be attacked by O'Connor, if the latter should escape or be released and found appellant at the O'Connor residence. He hired to take the risk. (38 Am. Juris., p. 845, sec. 171.)

Appellant knew of the dangers of the employment, when he entered the service, and while he did not know and could not foresee the escape of O'Connor from custody, still his employment, in anticipation of some such exigency, was for the purpose of guarding against just such a contingency as arose. If it be urged that appellant was not the employee of respondents and therefore not, as to respondents, chargeable with assumption of risk or contributory negligence, the answer would seem to inevitably follow that respondents, for the same reason, owed appellant no contractual duty.

It may be urged that the action of respondents, sheriff and superintendent, in permitting O'Connor to escape, so increased or augmented the dangers which appellant risked as to render them legally liable for negligence. The answer,

however, to such a suggestion is, that, under appellant's complaint, there would have been no such danger to increase or augment, had appellant not undertaken the hazardous task he assumed. It does not appear that either the sheriff or the hospital superintendent or O'Connor ever knew or heard of appellant prior to the shooting which wounded appellant; and so, clearly, as far as they were concerned, there was no malicious intent, illwill, or conscious lack of due care for appellant's personal safety any more than for the entire promiscuous body of the public.

There is an utter failure to charge respondents, sheriff and superintendent, with facts constituting them joint tort feasors. There is no authority for joining them as defendants in this action and demurrer was properly sustained on that ground. It is also thought that the complaint does not state facts sufficient to constitute a cause of action against either the sheriff or the superintendent and, as a matter of course, their sureties are not liable if their principals are not liable. (*Kanters v. Kotick,* 102 Wash. 523, 173 P. 329.)

Judgment affirmed. Costs to respondents.

Holden, J., and Johnson, D.J., concur.

GIVENS, C.J., concurring in part and dissenting in part.

I concur as to respondent Cromwell and his surety. I dissent as to respondent McMillan and his surety. The demurrer was properly sustained, therefore, on the ground that there was a misjoinder of parties defendant.

Eliminating respondent Cromwell and his surety, however, leaves for determination the question of whether the complaint states a cause of action against respondent McMillan and his surety, and if so, whether it is ambiguous, unintelligible, and uncertain. There is no ambiguity or uncertainty as to the essential facts, and they are clearly and intelligibly set forth.

The demurrers, of course, admit the factual allegations of the complaint well pleaded, which must, therefore, for the purpose of testing the sufficiency and adequacy of the complaint as stating a cause of action, be taken as true.

The criminal complaint filed against O'Connor by Hess charging him with assault with a deadly weapon was based upon O'Connor's attempt to shoot his (O'Connor's) wife. Respondent McMillan definitely knew that it was really for Mrs. O'Connor's safety and protection that O'Connor

was bound over to the district court and placed in respondent's custody pending his trial upon said charge.

This portion of paragraph 8 of the complaint,

"on the said 26th day of September, 1940, and at all times thereafter the only order or writ under which the said Dan O'Connor was confined was the order of commitment heretofore described as being issued by the said Honorable M. G. Whitney as Probate Judge on the 27th day of August, 1940, directing that Dan O'Connor be held and detained upon the charge of assault with a deadly weapon",

is in words which leave no doubt as to the meaning therein contained that no other order of any kind relative to the custody, incarceration, release, or transfer of O'Connor appears in the record because there was none. Since there was no other order, it necessarily could not appear in the record. A pleader cannot put into the record something which does not exist. Therefore, for the purpose of testing the sufficiency of the complaint the only order authorizing the sheriff to take any action in connection with O'Connor was the commitment under which O'Connor was remanded to the custody of the sheriff to be held and detained by him until he was legally discharged by an order of a court of competent jurisdiction, and otherwise to have O'Connor present for his trial in the district court.

Paragraph 7 of the complaint leaves no room for any construction or interpretation thereof justifying an assumption of good faith on the part of the sheriff.

"VII. That thereafter, to-wit; on the 25th day of September, 1940, in violation of said order of commitment then in force and effect, the said defendant S. J. McMillan carelessly, negligently, and unreasonably relieved said Dan O'Connor of his detention in the Kootenai County jail and caused his deputy Walter Cox to take such prisoner out of Kootenai County and to deliver him to the defendant James O. Cromwell as superintendent of the State Hospital South at Blackfoot, Idaho, on the 26th day of September, 1940."

The statements in the majority opinion that

"Respondents were in no way responsible for appellant's presence at the home of Grace Wark O'Connor and neither directly nor indirectly subjected appellant to the danger from which he suffered"

and that

"no facts or circumstances are alleged that would in any way indicate or from which an inference could be drawn,

that their [evidently including appellant sheriff] conduct was 'wanton', i. e., 'a reckless disregard for the safety of others' "

evidently overlook the allegations in the complaint, admitted by the demurrer, that

"thereafter the defendants S. J. McMillan * * *, having it within their power to apprehend the said Dan O'Connor and take him back into custody, carelessly, negligently, and wantonly permitted the said Dan O'Connor to remain at large and made no effort to apprehend him or to restrain him from his homicidal intentions and insane impulses, contrary to the proper and valid order of commitment as aforesaid; that various persons thereafter notified the defendant S. J. McMillan that Dan O'Connor was at large in Kootenai County and that the said defendant S. J. McMillan carelessly and negligently and in breach of duty made no attempt to apprehend him, although it was within his power to have done so;

"X. That the plaintiff was at all times mentioned herein an employee of said Grace Wark O'Connor and that his duties were to perform manual labor for the said Grace Wark O'Connor and, as said Dan O'Connor well knew, to furnish her and her family with protection against the said Dan O'Connor;

"XI. That, as a proximate result of the negligence and violation of the order of commitment hereinbefore referred to, on the 3rd day of May, 1941, the said Dan O'Connor, acting under insane and uncontrollable impulses, possessed himself of a shotgun and proceeded to the residence of Grace Wark O'Connor and her family and of the plaintiff near Cataldo, in Shoshone County, Idaho, and began to shoot at them, and did, with said shotgun, at such time and place shoot the plaintiff causing about thirty large size lead shot to enter his legs between the hips and the ankles and severely wounding him and causing him pain and suffering and damage to the extent of $25,000.00 as hereinafter more specifically set forth."

Mrs. O'Connor was not a stranger to the proceedings whereby O'Connor was placed in the custody of respondent sheriff. She was not just any one of the general body politic in Kootenai County or the State of Idaho. She had directly appealed, through Hess, to the chief law officer of the county for protection by O'Connor's arrest. It is

alleged that in wanton, wilful, and negligent disregard of this court order, the sheriff turned O'Connor loose, which was the result of the sheriff's actions, as appears admitted from this statement in the majority opinion: "The acts of the sheriff * * * in permitting O'Connor to escape and be at large." No interpretation or construction of the complaint is necessary to determine that it is therein alleged that respondent sheriff was notified that O'Connor was at large in Kootenai County where his wife resided and whom he had tried to kill, and that the sheriff had it in his power to retake O'Connor into his custody after receiving such information and negligently failed to do so. This was a flagrant violation of the order of commitment. *Cornell v. Mason,* 46 Ida. 112, 268 Pac. 8; *Price v. Pace,* 50 Ida. 353, 296 Pac. 189. Sablack and Jacobson had been hired by Mrs. O'Connor to defend and protect her against her husband. O'Connor having been once arrested for making such attempt and having been turned loose by the sheriff, Mrs. O'Connor was without further aid or assistance in that direction and was certainly justified in employing Sablack and Jacobson to protect her. Their defense of her therefore became her defense. What justification was there for the respondent sheriff to show such tender solicitude for the well-being of O'Connor by assertedly taking him to the asylum for his (O'Connor's) benefit, and utterly disregarding Mrs. O'Connor's resultant defenseless condition, to say nothing of the respondent's absolute flaunting of the court order requiring him to retain O'Connor in his custody? His duty in that particular was mandatory and not subject to the exercise of any discretion whatever. *Cornell v. Mason,* supra; Secs. 30-1701 and 30-1702, I.C.A. Under the pleading it is not left to conjecture as to what respondent should have foreseen, but knowledge and negligence on his part are alleged. The rule heretofore announced is compellingly applicable. *Burkland v. Oregon Short Line R. R. Co.,* 56 Ida. 703, 58 Pac. (2d) 773.

As further justification for exculpating respondent and his surety from liability the majority opinion states:

"The acts of the sheriff * * *, in permitting O'Connor to escape and be at large, were only a remote cause in comparison with the *negligence* of appellant." [Emphasis mine.]

Wherein were Sablack and Jacobson negligent? Where is allegation to support such an astounding statement? If Sablack and Jacobson were negligent in trying to defend

Mrs. O'Connor against her husband, who had been turned loose by the chief peace officer of the county and whom she, as well as the other citizens, had the right to look to for protection, then, of course, she was negligent in seeking protection. Were Sablack and Jacobson negligent because they were not agile and adroit in dodging the bullets from O'Connor's gun? What negligence was Mrs. O'Connor guilty of in seeking such protection as she could when the sworn officer of the law had absolutely violated his duty by turning her husband loose? The imputation of negligence in sustaining a demurrer to a complaint where contributory negligence has not been plead, no proof has been offered, and no jury has passed thereon, and thereby holding the sheriff and his surety not liable for flagrant violation of his duties is without justification. (*Kusah v. McCorkle,* 100 Wash. 318, 170 Pac. 1023, 1918C L. R. A. 1158.) There was no negligence on Mrs. O'Connor's part or on that of her defenders. (*State v. Cloud,* 150 Miss. 697, 116 So. 814.) If there is any such issue, it at least should be passed on by a jury. (*McCarty v. Boise City Canal Co.,* 2 Ida. 245, 10 Pac. 623; *Allan v. Oregon Short Line R. Co.,* 60 Ida. 267, 90 Pac. (2d) 707.)

The majority opinion further rests upon a distinction between liability in connection with civil actions and criminal actions. In effect, as I understand, the opinion holds that the sheriff may be liable for damages in dereliction of duty in connection with civil process but not in connection with criminal process because the one involves a duty to the individual, the other a duty to the public, relying upon *Worden v. Witt,* 4 Ida. 404, 39 Pac. 1114 and *Corker v. Pence,* 12 Ida. 152, 85 Pac. 388. These cases and those of similar import (*Davis v. State,* 30 Ida. 137, 163 Pac. 373; *Youmans v. Thornton,* 31 Ida. 10, 168 Pac. 1141) held that neither a county or county commissioners were liable for their negligence in either constructing or maintaining defective roads or bridges—in the earlier cases on the ground that to so hold would bankrupt the counties and prevent anyone from holding the office of county commissioner and that there was no statute imposing such liability; later placed upon the ground that the county, being an arm of the state, was immune as a part of the sovereignty and a governmental instrumentality. None of these cases considered the liability of a sheriff on his bond for alleged negligent acts in connection with the conduct of his office.

Further reliance is placed on *South v. Maryland*, 59 S. Ct. 396, 15 L. ed. 433. The force of that case as contended for by respondents has at least been weakened in that it has been construed as not making removal from office the sole remedy for neglect of duty by a sheriff and that damages may be recovered for such neglect resulting in an escape. (*State of Tennessee v. Hill*, 60 Fed. 1005.) True, the state there sued, but the damage herein was greater and the injury more personally traceable than therein. Furthermore, the absolution from liability declared in *South v. Maryland*, supra, was because there was no violation of duty in connection with process. (*State of Indiana v. Gobin*, 94 Fed. 48.) Herein there was absolute violation of the mandate of valid process.

In *State v. American Surety Co.*, 26 Ida. 652, 145 Pac. 1097, the court had occasion to consider the liability of an officer to an individual who had suffered the injury because of the official misconduct of the officer, and applied the test suggested in the majority opinion. That case involved the failure of a bank examiner to close a bank after he knew, or should have known, that it was insolvent. The suit was instituted by the depositors who placed money in such bank after that time and prior to the time the bank was closed. The court held they were entitled to recover against the bank examiner and his bondsmen. This holding supports appellants' contention herein. The majority opinion then proceeds to hold that there is no liability because the acts of the sheriff in turning O'Connor loose were not the proximate cause, asserting that it could not have been reasonably foreseen that as a result of such escape O'Connor would kill anybody. This court has recognized the liability of a peace officer in connection with neglect and violation of duty in connection with criminal process. (*Madsen v. Hutchison*, 49 Ida. 358, 290 Pac. 208; *Helgeson v. Powell*, 54 Ida. 667, 34 Pac. (2d) 957.)

This court has held the question of proximate cause is one for the jury.

"Appellants seek to recover in this action upon the theory that the keeping of dangerous explosives, in the instant case dynamite caps, in the place and in the manner they were kept by respondent constituted such negligence as would render respondent liable to appellants for the injuries sustained by William George Miller. Negligence, as well as the proximate cause of the injury, are questions of fact

for the jury, where the facts, or the inference to be drawn therefrom, are in any degree doubtful or such that fair minded men might reach different conclusions from the facts. [Citing authorities.] It is contended that the chain of causation is broken, and that the original negligence, if any, was not the proximate cause of the injury. While the picking of the dynamite cap with the wire may have been the immediate cause, or the nearest cause in point of time, it does not necessarily follow as a matter of law that it was the proximate cause. The rule of law applicable in such a situation is that where the defendant was guilty of original negligence, and, from the evidence, the inference may be reasonably drawn that the original negligence placed in motion the intervening cause of the injury, but that such injury would not have happened if it had not been for the original negligence, the defendant will be held liable. [Citing authority.] Where several causes combine to produce an injury, the last intervening cause is commonly referred to as the immediate cause, although some other agency, more removed in time or space may, in casual relation, be nearer to the result, and thus be the proximate responsible cause. [Citing authorities.] The jury would be called upon to determine whether respondent had or had not exercised that degree of care required to be exercised by it to prevent injury to a child of tender years by explosives kept upon its property. If respondent had failed to exercise that degree of care required, the jury would then be called upon to determine whether or not it was the proximate cause of the injury, or whether the obtaining of the explosives in the manner in which they were obtained by William George Miller, the way in which they were handled, and ultimately the picking of the cap with a wire, constituted such an intervening cause or causes as would relieve respondent of liability. [Citing authority.]" (*Miller v. Gooding Highway Dist.*, 55 Ida. 258, 41 Pac. (2d) 625.)

Even if there had been two concurring causes, i.e., O'Connor's presence and Sablack's and Jacobson's presence, and the latter were negligent, it would be for the jury to say which was the proximate cause. (*Miller v. Northern Pac. Ry. Co.*, 24 Ida. 567, 135 Pac. 845; *Idaho Gold Dredging Corp. v. Boise Payette Lbr. Co.*, 54 Ida. 765, 37 Pac. (2d) 407.) And as stated in *Carron v. Guido*, 54 Ida. 494, 33 Pac. (2d) 345:

"On the question of proximate cause *Binford v. Johnston,*

82 Ind. 426, 42 Am. Rep. 508, is in point. That was an action for damages because of the death of a boy who was killed by a bullet fired from a toy pistol by his brother, a child six years old, the ammunition having been sold by defendant to children for use in the pistol. The court said:

" '. . . it is firmly settled that the intervention of a third person or of other and new direct causes does not preclude a recovery if the injury was the natural or probable result of the original wrong . . . The rule goes so far as to hold that the original wrong-doer is responsible, even though the agency of a second wrong-doer intervened . . .

" 'Although the act of the lad Bertie intervened between the original wrong and the injury, we cannot deny a recovery if we find that the injury was the natural or probable result of appellant's original wrong. In *Henry v. Southern Pacific R. Co.*, 50 Cal. 176, it was said: "A long series of judicial decisions has defined proximate, or immediate and direct damages to be the ordinary and natural results of the negligence; such as are usual and as therefore might have been expected." '

"The Indiana court further said:

" 'In *Weick v. Lander*, 75 Ill. 93, it is held that "where an act unlawful in itself is done, from which an injury may reasonably and naturally be expected to result, the injury, when it occurs, will be traced back and visited upon the original wrong-doer." In the course of the opinion and as a commentary upon cases reviewed, it is said: "The principle announced is, that whoever does an unlawful act is to be regarded as the doer of all that follows." ' (See, also, *Anderson v. Settergren*, 100 Minn. 294, 111 N. W. 279.) "

The question of intervening cause is for the jury. *Allen v. Cavin*, 179 Okla. 460, 66 Pac. (2d) 40.

Under the majority opinion, a sheriff, whenever he deems it for the best interests of a defendant not to comply with the process of a court of record, may at his own whim and pleasure pursue such actions as he deems best for the particular defendant without any regard whatever to the safety or well-being of the person for whose protection the particular defendant has been arrested or society at large. To condone and approve such a situation, it seems to me, would be a travesty on justice and a mockery of orders of the courts. When a homicidal maniac, who has once dis-

played and attempted to carry into effect his lethal proclivities, has been placed in the custody of a sheriff under valid process, for the sheriff to thereafter turn him loose shows an utter disregard for the safety of the citizens of the community where the insane person may be roaming at large.

Budge, J., concurs in this dissent.