931 P.2d 634

Lenore **KESSLER**, individually, and as Personal Representative of the Estate of Bobbie F. Kessler, deceased, Plaintiff–Appellant,

v.

Bob **BAROWSKY**, Payette County, State of Idaho Department of Law Enforcement, Richard L. Cade, Ronald Moore, David L. Neal, Stephen C. Jones, Michael R. Nauman, David L. Case, and Wayne March, Jr., Defendants–Respondents.

No. 21672.

Court of Appeals of Idaho.

Jan. 31, 1996.

WALTERS, Chief Judge.

Lenore Kessler, individually and as personal representative of the estate of Bobbie F. Kessler, her deceased husband, appeals from a summary judgment dismissing her claims of negligence, asserted under the Idaho Tort Claims Act, and her claim that police officers used excessive force in effecting her husband's arrest, in violation of his civil rights pursuant to 42 U.S.C. § 1983. For the reasons stated, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 12, 1992, the Payette County Prosecuting Attorney, Bruce Birch, contacted the Idaho State Police (ISP) and requested the assistance of its Crisis Response Team (CRT)[1] in serving a felony arrest warrant on Bobbie Kessler. Kessler was a reserve deputy for the Payette County Sheriff's Office. He had been charged with three counts of lewd and lascivious conduct and with eight counts of rape, all involving his daughter. These charges were the result of a report made to Birch by Kessler's daughter on December 11, 1992.

Based on interviews with Kessler's daughter, Kessler's son, and personnel from the Payette County Sheriff's Office, Birch believed that Kessler could react violently to an arrest, and would probably be armed when approached. Birch made his concerns known to the ISP. In subsequent meetings, the CRT was informed that Kessler was a former special forces member, was trained in martial arts and was proficient with a weapon. Members of the CRT were also apprised that Kessler was usually armed.

Following the issuance of a warrant, members of the CRT developed a plan for Kessler's arrest. They decided that the warrant should be served on Kessler in the Payette County Sheriff's Office, where members of the public would not be present, in an attempt to control the arrest. The sheriff's office was informed of the decision and agreed to cooperate.

Jim Jones & Associates, Boise, for appellant. John C. McCreedy argued.

Quane, Smith, Howard & Hull, Boise, for respondent State of Idaho Department of Law Enforcement. Phillip J. Collaer argued.

Hamlin & Sasser, Boise, for respondents Bob Barowsky and Payette County. James D. Carlson argued.

---

1. According to the state's brief, the CRT was formed in 1988. One of its purposes is to provide assistance to other law enforcement agencies in the service of high risk felony warrants. The CRT also provides assistance in other high risk circumstances, such as barricaded subjects and hostage situations.

On December 14, 1992, Kessler was requested to come to the sheriff's office in his capacity as a reserve deputy. When Kessler arrived, he entered the building through a door which then electronically locked behind him. As Kessler walked down the hall, CRT officer Jay Jensen stepped into the hallway, identified himself as an ISP officer and informed Kessler that he was under arrest. Jensen was carrying a submachine gun which he pointed at Kessler. Jensen was also wearing a camouflage uniform, which is the CRT's standard operating uniform. When Kessler did not submit to Jensen's announcement, CRT officers Wayne Marsh and David Case stepped forward and sprayed Kessler in the face with Cap–Stun, a capsicum oil spray, in an attempt to incapacitate him. Kessler brought his hands up to his face, turned, walked back toward the door through which he had entered and then lunged at the door in an attempt to escape. During this time, CRT members repeatedly shouted to Kessler that he was under arrest, to lay face down on the floor and to raise his hands.

After discovering he was unable to open the door, Kessler assumed a crouched position, turned, drew a handgun from a holster on his belt and pointed it toward CRT officers Stephen Jones and Michael Nauman. In response, Jones, Nauman and Marsh fired their weapons. After being shot, Kessler again pointed his weapon toward the officers as he conducted a defensive roll on the floor. The officers fired their weapons again. Kessler died of a gunshot wound sustained during the second discharge of weapons. The fatal bullet entered his hip and traveled upward into Kessler's torso. Kessler never fired his weapon.

In July 1993, Lenore Kessler filed an action in Ada County to recover damages for the negligent and wrongful death of her husband. The claims were predicated on the Idaho Tort Claims Act and 42 U.S.C. § 1983. Lenore also requested a jury trial. After venue was changed from Ada County to Payette County, the respondents filed motions for summary judgment. The district court granted the motions following a hearing. Lenore has appealed.

## ISSUES

Lenore asserts that the district court erred in granting the respondents' motions for summary judgment because the court exceeded its role by weighing conflicting evidence in the record, making credibility determinations and failing to construe the record in the light most favorable to the nonmoving party. She contends that Kessler's death occurred as a result of the respondents' (1) negligence in planning the arrest; (2) negligence in effecting service of the warrant and making the arrest; and (3) negligence and failure to properly train, deploy and supervise the arresting officers. Lenore maintains that because of their negligent acts, the supervisors and officers involved should be liable in both their official and individual capacities. She also argues that the respondents' use of excessive force violated Kessler's civil rights pursuant to 42 U.S.C. § 1983.

## STANDARD OF REVIEW

Our Supreme Court provided the following standard of review for summary judgment in *Featherston v. Allstate Insurance Co.*, 125 Idaho 840, 875 P.2d 937 (1994):

When faced with an appeal from a summary judgment, this Court employs the standard of review properly applied by the trial court when originally ruling on the motion. In order to determine whether judgment should be entered as a matter of law, the trial court must review the pleadings, depositions, affidavits, and admissions on file. On review, as when the judgment is initially considered by the trial court, this Court liberally construes the record in the light most favorable to the party opposing the motion, drawing all reasonable inferences and conclusions in that party's favor. If reasonable people could reach different conclusions or draw conflicting inferences from the evidence, the motion must be denied. However, if the evidence reveals no disputed issues of material fact, the trial court should grant summary judgment.

*Id.* at 842, 875 P.2d at 939 (citations and quotation marks omitted).

## DISCUSSION

### A. State Law Claims

#### 1. Negligence

The issues presented by Lenore on appeal are based upon her allegations that the officers were negligent in planning Kessler's arrest, were negligent in effecting the arrest and that they received negligent training, deployment and supervision during the arrest.

■ The elements of an action based on common law negligence have been summarized as: (1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage. *Slade v. Smith's Management Corp.*, 119 Idaho 482, 487, 808 P.2d 401, 406 (1991). Our Supreme Court held in *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297 (1987), that although questions of fact as to negligence are for the jury or trier of fact to decide, the question of "duty" is a question of law for the court to decide. *Id.* at 348, 372 P.2d at 317. The court is required to determine if, under the facts of a given case, a duty is owed by a defendant to the plaintiff and, also, to determine the scope or extent of that duty. *Id.*

#### a. Negligence in Planning the Arrest

Lenore argues that the officers were negligent in planning the arrest. She bases her contention on the affidavit of her witness, Donald P. Van Blaricom, a police science expert. Van Blaricom reviewed the entire factual record and concluded that the plan for taking Kessler into custody was "so tactically flawed that the adverse outcome was more probable than not." In his affidavit, Van Blaricom determined that Kessler's death was proximately caused by (1) the Payette County officials' unreasonable portrayal of Kessler as a "superhuman" danger; and the ISP's unreasonable reliance upon this information; (2) improper tactics used by the officers which escalated their confron-

tation with Kessler; and (3) the officers' improper use of Cap–Stun for which they possessed neither any training nor any experience.[2] Lenore further asserts that the district court erroneously failed to address Van Blaricom's conclusions.

■ The record reveals that prior to the encounter with Kessler, the officers involved were informed by Kessler's daughter and Kessler's son, that Kessler would not submit to an arrest, that he would be armed and that he would use his weapon. The officers also had learned that Kessler was a former special forces member, was trained in martial arts, was proficient with a weapon, and was usually armed. Given this information, the officers planned to request that Kessler come to the sheriff's office in his capacity as a reserve deputy. The record shows that the officers' primary concern during the planning stage was their desire to limit Kessler's escape options and to reduce the risk of harm to participating officers and the public in general. Because of Kessler's reported proficiency in martial arts and the high likelihood that he would be armed, the officers wanted Kessler's ability to resist an arrest to be overcome quickly, minimizing his opportunities to use a weapon. Based upon the information that Payette County officials and ISP officers possessed prior to the arrest, we hold that a reasonable trier of fact would conclude that the portrayal of Kessler developed by the Payette County officials was reasonable. We further hold that the ISP's reliance upon this information was reasonable.

Lenore next argues that the officers were negligently trained, and that they possessed neither the training nor the experience to properly use Cap–Stun. However, Lenore has failed to show that the officers' alleged lack of training resulted in misuse of the Cap–Stun or adversely affected the outcome of the intended arrest. The officers' training with Cap–Stun was not the proximate cause of Kessler's death, and Lenore has failed to show any resulting causal connection.

---

**2.** In his affidavit, Van Blaricom also concluded that the "officers continued use of deadly force

when Kessler was no longer a threat to them." This conclusion is addressed later in this opinion.

We consider also the officers' duty to the public in order to determine if the officers were negligent in planning the arrest. The officers could not have discounted the information they had received regarding Kessler. If they had, and then tried to arrest Kessler in a public area, the shooting spree which occurred could have wounded, perhaps fatally, innocent bystanders. By choosing to arrest Kessler inside the hallway in the Payette County sheriff's office, the officers acted reasonably, for the protection of the public.

Finally, we consider Lenore's assertion that the court did not address Van Blaricom's conclusions. The record shows that Van Blaricom's affidavit was admitted into evidence. Therefore, it was before the court for consideration. The fact that the court failed to specifically mention the affidavit in its decision does not mean that Van Blaricom's conclusions were not taken into consideration before the court ruled on the summary judgment motions. Thus, we find no merit to this claim.

We uphold the district court's conclusion that the officers did not breach any duty owed to Kessler in planning Kessler's arrest and thus were not negligent in that regard.

### b. Negligence in Executing the Arrest

Lenore argues that the officers breached their duty to Kessler by negligently executing the arrest. She contends that (1) the officers sprayed Kessler with Cap–Stun before providing him with an opportunity to surrender; (2) Kessler never "aimed" his gun at the officers and, therefore, the officers' use of deadly force was negligent; and (3) members of the CRT wore camouflaged clothing and failed to consider the likely reaction of surprising a Vietnam combat veteran while they were dressed in this manner.

■ During the course of serving an arrest warrant, both the citizen and the police officer have individual duties. The citizen has the duty to submit to the authority of the officer without resistance. I.C. §§ 18–705 and 19–610. The arresting officer owes duties to both the citizen being arrested and to the public. The officer making the arrest must not subject the person being arrested to any more force or restraint than is necessary for the arrest and detention. *Anderson v. Foster*, 73 Idaho 340, 345, 252 P.2d 199, 202 (1953); *State v. Hartwig*, 112 Idaho 370, 376, 732 P.2d 339, 345 (Ct.App.1987). "If the person to be arrested either flees or forcibly resists, the officer may use all reasonable and necessary means to effect the arrest and will be justified in using deadly force under conditions set out in section 18–4011, Idaho Code." I.C. § 19–610. Idaho Code § 18–4011(2) provides in pertinent part that homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance:

> When reasonably necessary in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty.... Use of deadly force shall not be justified in overcoming actual resistance unless the officer has probable cause to believe that the resistance poses a threat of death or serious physical injury to the officer or to other persons.

Furthermore, our Supreme Court, in *Jacobson v. McMillan*, 64 Idaho 351, 132 P.2d 773 (1943), discussed duties owed by arresting officers to the general public. In *Jacobson*, the Kootenai County Sheriff and the superintendent of the state hospital were sued for injuries resulting from an assault committed by an escaped prisoner. It was alleged that the escape resulted from the sheriff's negligence in delivering the prisoner to the state hospital, and the superintendent's corresponding negligence in permitting the prisoner to escape. Addressing the duty of the sheriff, the Court noted that the "duties of a peace officer, who has custody of a prisoner are two-fold, (1) to the public and (2) to the prisoner." 64 Idaho at 358, 132 P.2d at 777. Here, the officers had a duty to the general public in addition to the duty owed to Kessler. The officers' duty to the general public when arresting a potentially dangerous individual is to protect innocent bystanders from any harm the arrestee may inflict upon them during the process of being arrested.

■ We first address whether the officers breached their duty to Kessler. According

to the transcript of the hearing on the summary judgment motions, Jensen testified that as Kessler walked down the hallway of the courthouse, Jensen stepped out from behind a hiding place, identified himself as an ISP officer and told Kessler he was under arrest. Jensen stated that Kessler then "reached under his coat." Officer Case testified that Kessler "brought his hand up to his hip;" Nauman testified that Kessler "reached down;" and Marsh testified that he "didn't see [Kessler] reach." The record shows that it was only after Kessler's movements in this regard that the officers sprayed him in the face with Cap–Stun. It is undisputed that Kessler was given an opportunity to surrender before being sprayed. Once given that opportunity, he chose instead to move in a manner suggesting that he planned to reach for his gun. There is no evidence in the record indicating that Kessler tried to surrender to the officers after being informed that he was under arrest and prior to being sprayed in the face with Cap–Stun. Accordingly, we hold that the officers did not breach any duty owed to Kessler by allegedly depriving him of the opportunity to submit to the arrest.

We next address the issue of whether Kessler "aimed" his gun at the officers. After being sprayed with Cap–Stun, Kessler put his hands up toward his face, turned and fled back to the door from which he had entered. Upon finding the door locked, Kessler dropped to the floor and pulled a gun on the officers. These facts are undisputed. It is also undisputed that once Kessler's gun was drawn, Kessler pointed it in the direction of the officers. We are not persuaded that it is necessary to make a distinction between the gun being "pointed in the direction of the officers" and it being "aimed" at the officers. Once Kessler pulled the gun, the officers had reasonable cause to believe that Kessler's forceful resistance posed a threat of death or serious physical injury to the officers. As a matter of law, the officers had a right to fire their weapons at Kessler after Kessler drew his gun on them. No genuine issue of material fact has been demonstrated on this claim.

We conclude that the officers were not negligent in attempting to execute Kessler's arrest.

### 2. Supervisory Liability and Immunity Under the Idaho Tort Claims Act

Because we conclude that the officers were not negligent in the planning of the arrest and that their actions at the time of the arrest were reasonable and lawful, we do not reach the issues of supervisory liability under Lenore's negligence claim or whether any of the immunities contained within the Idaho Tort Claims Act are applicable.

### B. Federal Law Claims

### 1. Excessive Force

Lenore argues that the officers' use of excessive force during the arrest violated Kessler's Fourth Amendment right against unreasonable seizures of a person, thus creating liability under 42 U.S.C. § 1983. She claims that such force included (1) confronting Kessler with a loaded submachine gun; (2) spraying Kessler with Cap–Stun before he had a chance to surrender; (3) wounding him with three non-fatal gun shots; (4) fatally wounding Kessler while he was laying with his backside facing the officers and posing no threat to them; and (5) handcuffing and restraining Kessler after he had been fatally wounded. To substantiate her claims, Lenore relies upon Van Blaricom's affidavit in which he concluded that the officers "continued to use deadly force when it was no longer objectively reasonable to do so and thereby caused the fatal wound to ... Kessler...."

■ Claims of excessive force in the arrest of a suspect are analyzed under the "reasonableness" standard of the Fourth Amendment to the United States Constitution. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). Guided by *Graham*, the Fifth Circuit Court, in *Reese v. Anderson*, 926 F.2d 494 (5th Cir.1991), enunciated a three-part test for § 1983 excessive-force claims. To prevail on such a claim, a plaintiff must show: (1) a significant injury, which (2) resulted directly and only from the use of force that was

clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable. *Id.* at 500; *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir.1989).

Applying the test enunciated in *Reese*, it is undisputed that Kessler suffered a significant injury, and that his death "resulted directly and only from" the shooting. The question is whether the amount of force used was "clearly excessive" and "objectively unreasonable."

The United States Supreme Court has instructed on the proper standard for this inquiry:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... [T]he "reasonableness" inquiry in an excessive force case is an objective one: The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872.

■ In answering this question, we consider the totality of the circumstances. *Id.* 490 U.S. at 396, 109 S.Ct. at 1871–72. In particular, we examine whether "the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest." *Id.*

Discussing the apprehension of a suspect, the Supreme Court has explained:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). *See also Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994).

■ Applying these standards, we must conclude that the officers' shooting of Kessler was reasonable and not excessive. As described above, the information possessed by the officers strongly indicated that Kessler would forcibly resist the arrest. From the events noted, Kessler did not submit when placed under arrest, but rather made a motion indicating he was reaching for a gun. Kessler also did not surrender when ordered to do so after being sprayed with Cap–Stun. Once Kessler discovered that he was locked in the hallway of the courthouse, he went into a crouched position, pulled a gun on the officers and pointed it toward them, even after officers repeatedly told Kessler that he was under arrest and ordered him to raise his hands and lay face down on the floor.

Under these circumstances, a reasonable officer could well fear for his safety and that of others nearby. He could reasonably believe that since Kessler had pulled the gun and pointed it toward officers, Kessler was about to shoot. That is, an officer would have probable cause to believe that "the suspect pose[d] a threat of serious physical harm." *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701. The officers had repeatedly warned Kessler to raise his hands and to lay face down on the floor and they were then faced with a situation which could cost the life of any of the officers. Under such circumstances, an officer is justified in using deadly force to defend himself and others around him.

Lenore argues that the force used by the officers was excessive because they confronted Kessler with a submachine gun, Kessler was wounded with three non-fatal gunshots, he was fatally wounded from a gunshot which entered his hip, and because the officers handcuffed Kessler after he was wounded. Given that Kessler still pointed his gun after being wounded, it was reasonable for the officers to continue to fear for their safety. The officers had reasonable cause to believe that Kessler continued to pose a threat of serious physical harm. Under such circumstances, we believe that the officers' actions after Kessler raised his gun at them the second time were justified.

### 2. Supervisory Liability.

Because we conclude that the officers did not use excessive force in the arrest of Kes-

sler, we do not reach the issue of supervisory liability pursuant to 42 U.S.C. § 1983.

## CONCLUSION

We hold that the district court used the correct standard of review in determining whether to grant respondents' motions for summary judgment. We conclude that there was no .genuine issue of material fact with regard to whether the respondents' were: (1) negligent in planning the arrest; (2) negligent in effecting service of the warrant and arrest; and (3) negligent in training, deploying, and supervising the arresting officers. We also hold that the respondents' use of deadly force did not violate Kessler's civil rights pursuant to 42 U.S.C. § 1983.

Accordingly, the respondents were entitled to summary judgment as a matter of law. The district court's order granting respondents' motions for summary judgment is affirmed. Costs to respondents; no attorney fees awarded on appeal.

LANSING and PERRY, JJ., concur.